FILED
United States Court of Appeals
Tenth Circuit

December 23, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

NEIL JASON WILFONG,

Defendant-Appellant.

No. 07-6214

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CR-07-103-001-H)**

---

John C. Richter, United States Attorney, (Jonathon E. Boatman, Assistant United States Attorney, with him on the brief), Oklahoma City, Oklahoma, for Plaintiff-Appellee.

June E. Tyhurst, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for Defendant-Appellant.

---

Before **HARTZ**, **McWILLIAMS** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

---

Neil Jason Wilfong pled guilty to charges arising from a bomb threat he

made against Tinker Air Force Base, which resulted in the evacuation of a

building at the base for several hours. As part of his plea, Mr. Wilfong agreed to pay restitution to the government. The question before us is whether the restitution may include compensation for the employee work hours lost as a result of the evacuation. We conclude that it can. We also affirm Mr. Wilfong's above-guidelines sentence.

## I. BACKGROUND

On December 15, 2006, at around 7:30 a.m., Mr. Wilfong called Tinker Air Force Base, asking to speak to his mother, Fran Ferreira. The person taking the call said that Ms. Ferreria was not in the office and asked if Mr. Wilfong wanted to leave a message. Wilfong replied: "Well, there's a bomb in the building." The building—called Building 3001—was evacuated. The evacuation lasted between two-and-a-half and three-and-a-half hours (the parties disagree on the exact amount of time) and involved thousands of employees. There was no bomb; the threat had been a hoax.

Federal agents identified Mr. Wilfong as the caller and located him at the home of his girlfriend. Officers set up a blockade around the house, but Wilfong left the home (apparently carrying a loaded crossbow) and drove off in his truck. After a high speed chase, he was taken into custody. After the court determined he was competent to stand trial, Mr. Wilfong pled guilty to calling in the bomb

threat, in violation of 18 U.S.C. § 844(e).[1]  He was sentenced to 48 months

imprisonment, which represented an upward variance from the recommended

sentencing guidelines range of 24-30 months.  He was also ordered to pay

$475,631.00 in restitution under the Mandatory Victims Restitution Act (MVRA).

The bulk of the restitution was for lost employee work hours caused by the

evacuation.  Mr. Wilfong appeals the district court's decision to order restitution

based on the loss of employee work hours at the Tinker Base.  He also appeals his

above-guidelines sentence.

## II.  THE RESTITUTION ORDER

Federal courts may not order restitution in criminal cases except "as

explicitly empowered by statute."  *United States v. Nichols*, 169 F.3d 1255, 1278

(10th Cir. 1999) (internal quotation marks omitted).  The Mandatory Victims

Restitution Act, 18 U.S.C. § 3663A, requires persons convicted of certain

offenses to pay restitution to those harmed by their acts.  The Act prescribes a

different methodology for calculating restitution for property crimes and for

bodily injury crimes.  In cases where there is bodily injury to a victim, the statute

allows for restitution for the costs of medical care, occupational therapy, and "for

---

[1] The indictment charged that Mr. Wilfong "through the use of a telephone, willfully made a threat and maliciously conveyed false information knowing it to be false to Tinker Air Force Base concerning an attempt and an alleged attempt to be made to kill, injury, and intimidate individuals and unlawfully to damage and destroy a building by means of an explosive.  All in violation of 18 U.S.C. § 844(e)."

income lost by such victim as a result of such offense." 18 U.S.C. § 3663A(b)(2)(A)-(C). In cases where the offense has resulted in "damage to or loss or destruction of property of a victim," the statute requires the defendant either to return the property or, if return is impossible, impractical, or inadequate, to pay "an amount equal to the greater of: (I) the value of the property on the date of the damage . . ., or (II) the value of the property on the date of sentencing," minus the value of any part of the property that may have been returned. 18 U.S.C. §3663A(b)(1)(B)(i)(I)-(II). Section 3663(b) does not expressly authorize restitution for lost income or lost profits in property damage cases, and the term "value" is undefined. It is undisputed that this is a property damage case, not a bodily injury case.

Mr. Wilfong does not dispute that his offense is one for which restitution is mandatory under the MVRA. However, he argues that he cannot be required to pay restitution for the value of the lost employee work time entailed by his phony bomb threat. He offers two related arguments in support of this conclusion: (1) that restitution for employee work hours is tantamount to restitution for "lost income" and is not authorized by the MVRA, and (2) that restitution for employee work hours would be a form of "consequential damages," which this Court has interpreted the MVRA to disallow.

A. Loss of Employee Work Hours

-4-

Looking to the language of the statute and its evident purposes, we have no hesitation in affirming the district court's award of restitution. An employee's work time is the property of the employer. *United States v. Hand*, 863 F.2d 1100, 1103 (3rd Cir. 1988). When Mr. Wilfong issued his bomb threat and Building 3001 was evacuated, Tinker Air Force Base lost the value of this "property" just as surely as a printing plant would lose the value of its property if an arsonist struck a match to its paper supply. Value was destroyed. The property could not be returned. There would be no question, in the arson case, that restitution should include the value of the paper that was destroyed. In this case, the cost of the lost employee work time should similarly be included in the restitution order. As the Third Circuit wrote in *Hand*, "When the time for which the government compensated its employees was 'lost' because of [someone's] illegal acts," it is just "as significant a financial loss to the government as when, in [another case] food stamps were stolen and fraudulently used." 863 F.2d at 1103.

The Supreme Court has stated that "the ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event." *Hughey v. United States* 495 U.S. 411, 416 (1990) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1936 (1986); BLACK'S LAW DICTIONARY 1180 (5th ed. 1979)). Before Mr. Wilfong's bomb threat, Tinker Air Force Base was entitled to the value of the services of its employees. Unless Mr. Wilfong compensates for this loss, the purpose of restitution will not have been met.

When property is damaged or lost and cannot be returned, the victim is entitled under the plain language of the statute to receive as restitution an amount equal to "the value of the property on the date of the damage, loss, or destruction." 18 U.S.C. § 3663A(b)(1)(B)(i)(I). The statute does not define the term "value," but one logical way to assess the value of the lost property is by its cost to the victim—how much the victim paid for the lost property.[2] That is what the district court did, and we see nothing wrong with its reasoning.

But perhaps matters are not that simple. As Mr. Wilfong notes, the MVRA authorizes restitution for "lost income" in bodily injury cases but contains no such provision for cases of injury to property. Some courts have inferred from this statutory difference that Congress has not authorized (and therefore has impliedly prohibited) restitution for lost income or lost profits in property damage cases. In *United States v. Mitchell*, 876 F.2d 1178 (5th Cir. 1989), for example, the defendant was convicted of possession of stolen property, namely three Mack trucks. As part of restitution, the district court ordered the defendant to pay the

---

[2] We do not hold that the cost to the victim is the only reasonable form of valuation. In some cases, replacement cost may be more appropriate. If, for example, Tinker Air Force Base had been forced to pay the employees time and a half to work on weekends to make up for their lost time during the bomb scare, that cost might well have been allowable as the value of the lost property. In other cases, repair or restoration costs may be most appropriate. *See, e.g.*, *United States v. Barton*, 366 F.3d 1160, 1167 (10th Cir. 2004); *United States v. Quarrell*, 310 F.3d 664, 678 (10th Cir. 2002). The value of the defendant's property loss is not limited to the gain to the defendant, *United States v. Anglian*, 784 F.2d 765, 767 (6th Cir. 1986), which in this case would be zero.

owners of the trucks the income they lost as a result of the thefts, calculated by

multiplying the daily earnings the victims would have made from the use of the

trucks by the number of days the trucks were illegally held by the defendant. The

government defended the restitution order, in part, on the ground that denying

recovery for lost income would fall short of the statutory goal of full

compensation to victims for their losses. The Fifth Circuit reversed, finding that

lost income could not properly be the object of restitution. It pointed to the

difference between 18 U.S.C. § 3663(b)(1), which authorizes restitution for lost

income in bodily injury cases, and 18 U.S.C. § 3663(b)(2),[3] which makes no

mention of lost income or profits in property damage cases. *Id*. at 1183. It

explained:

> [T]he fact that the goals of the Act may be thwarted by denying lost income restitution does not authorize us to ignore the plain language of the statute. Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. *See* 18 U.S.C. § 3663(b)(2). Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it amends the statute to include lost income, courts may not order such restitution in property cases.

*Id*.

---

[3] *Mitchell*, like *Milstein* and *Sharp* (which we discuss below), was decided under a predecessor statute to the MVRA, the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663-64, which contains identical relevant language. Interpretations of the VWPA are relevant to the MVRA, except where the language is different. *United States v. Brock-Davis*, 504 F.3d 991, 996 (9th Cir. 2007).

In *United States v. Sharp*, 927 F.2d 170 (4th Cir. 1991), defendants responsible for exploding a home-made pipe bomb at a mine were ordered to pay restitution for the "loss of income" caused by the destruction of the mine. *Id*. at 172–73. It is not clear from the appellate opinion how this loss was measured. Adopting the reasoning of *Mitchell*, but without much analysis, the Fourth Circuit reversed the award. It commented that "on the plain language of the statute, the district court should not have included lost income in the calculation of restitution." *Id*. at 174.

Other appellate decisions are in seeming conflict. In *United States v. Milstein*, 481 F.3d 132 (2d Cir. 2007), the defendant was convicted of fraudulently distributing misbranded drugs in violation of trademark law. The district court ordered restitution to drug manufacturers based on the value of lost sales. *Id*. at 137. The Second Circuit noted the holdings of *Mitchell* and *Sharp*, but concluded that "[n]othing in the text or legislative history of the [Act] precludes restitution for lost profits under section 3663(b)(1) where such losses amount to the 'value of the property' the victim lost." *Id*. at 136–37. The court reasoned that trademarks are a recognized property right, that the term "property" in the statute includes intangible property, and that "[t]he standard measure for determining the value to the victim of infringed trademarks is the victim's lost sales." *Id*. at 137. Consequently, the court concluded: "Here, the District Court, acting within its broad discretion to determine restitution, properly employed this

measure, and, based on the evidence before it, made a reasonable estimate of the amount of lost sales." *Id.*

The Sixth Circuit followed a similar approach in *United States v. Lively*, 20 F.3d 193, 202-03 (6th Cir.1994). The defendants had fraudulently acquired merchandise from mail-order retailers and could not return it. The district court ordered restitution in the amount of the retail price of the stolen goods; on appeal, the defendants argued that they could be held responsible only for the cost to the victim, that is, the wholesale price. The Sixth Circuit upheld the district court's award, reasoning:

> [I]n order to restore the mail order companies to their prior state of well being the order of restitution had to include their lost profits. Before [the defendant] victimized these companies, they had merchandise that could be sold at the retail price level. After [the defendant] victimized these companies, they no longer had this merchandise to sell at the retail price level. [The defendant] precluded these companies from being able to realize the profits of their labor. Thus, including lost profits in the order of restitution was the only way to assure the restoration of these victims to their prior state of well being.

*Id.* at 202-03.

Fortunately, in this case we need not determine whether the two lines of precedent are in genuine conflict or, if they are, which is correct. Contrary to Mr. Wilfong's argument, awarding restitution to Tinker Air Force Base for lost employee work time, valued at the employees' wages, is not economically equivalent to compensating for lost profits or income. The restitution award did

nothing more than give the government compensation for the cost of the property that was destroyed by Mr. Wilfong's actions. In accounting terms, the restitution order compensated for the cost of an input that was destroyed, not for the diminution in future income. If the district court had ordered Mr. Wilfong to pay for the value of the product the employees would have created if they had been able to work (whatever that would be), Mr. Wilfong might have a point. If a widget factory were shut down by a bomb threat, there would be a difference between restitution based on the hourly wages of the workers versus restitution based on lost profits from reduced widget production. Under the logic of *Mitchell* and *Sharp*, restitution based on the latter would arguably be impermissible. But on these facts, even under the legal analysis of *Mitchell* and *Sharp*, the district court was within its discretion to award restitution for the cost to the government of the property that Mr. Wilfong destroyed, namely the employee work hours that the government paid for but did not receive.

B. Consequential Damages

Mr. Wilfong also argues that the restitution amount awarded by the district court amounts to "consequential" or "incidental damages." Mr. Wilfong is correct that we have interpreted the MVRA as not allowing recovery for consequential damages. *See, e.g., Barton*, 366 F.3d at 1167 (noting that "there is general agreement that a restitution order under the MVRA cannot encompass consequential damages resulting from the defendant's conduct"). But we do not

-10-

think it is true that the lost work time associated with the evacuation amounts to a mere "consequential damage."

This argument is closely related to one we have just rejected, in that lost profits are often a form of consequential damages. But the two arguments are not the same. The first argument focused on the presumed difference between the value of property and the income it generates. The consequential damages argument focuses instead on causation. Consequential damages are damages that are not the direct and immediate result of the injury, but depend in part on factors outside the control or expectation of the parties. *See* BLACK'S LAW DICTIONARY 394 (8th ed. 2004) (defining consequential damages as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from that act"). As another court put it in the restitution context, "we have approved restitution awards that included losses at least one step removed from the offense conduct itself," but "[t]he causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable." *United States v. Gamma Tech Indus.*, 265 F.3d 917, 928 (9th Cir. 2001).

The causation here was both proximate and direct. The natural and expected (whether or not intended) consequence of issuing a bomb threat is that the building will be evacuated, thus leading to a loss in work time. Indeed, at the sentencing hearing Mr. Wilfong conceded that the threat was "why they evacuated the building." According to the Ninth Circuit, the "main inquiry for causation in

-11-

restitution cases [is] whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." *United States v. De La Fuente*, 353 F.3d 766, 772 (9th Cir. 2003) (internal quotation marks omitted). Mr. Wilfong cannot argue that the injury to Tinker Air Force Base was attributable to any intervening cause or unexpected circumstance. He told the person who answered his telephone call that there was a bomb in Building 3001, and the building accordingly was evacuated. The damages were therefore not consequential.

Our conclusion follows *a fortiori* from the holding of the Ninth Circuit in *De La Fuente*. In that case, the defendant mailed letters containing white powder and a threatening note to a former boss and former girlfriend, identifying the powder as anthrax. One of the letters accidentally broke open in a post office processing center, causing the building to be evacuated and necessitating a hazardous materials cleanup. 353 F.3d at 768. The Ninth Circuit held that the losses sustained, which included employee work hours,[4] were both "directly and proximately caused" by the threats, despite the defendant's argument that the threats had been mailed to other parties and the fact that the letter had come open in the postal processing center was purely adventitious. *Id*. at 773. Here the

_____

[4]Mr. Wilfong points out that De La Fuente did not distinguish in his appeal between lost employee work time and other injury suffered by the postal service, such as clean-up cost. For purposes of the consequential damages argument, however, there would appear to be no distinction.

causation was even more direct: Mr. Wilfong phoned his bomb threat to Building 3001 at Tinker Air Force Base. These damages cannot be described as remote or indirect, or the causal chain as attenuated.

### III.  THE ABOVE-GUIDELINES SENTENCE

Mr. Wilfong separately challenges his above-guidelines sentence. When a defendant makes a timely objection to the sentence, we review for abuse of discretion. *See, e.g., United States v. Smart*, 518 F.3d 800, 805-06 (10th Cir. 2008). When a defendant fails to object to a sentence, the standard is plain error. *United States v. Romero*, 491 F.3d 1173, 1176-77 (10th Cir. 2007). The two parties disagree on whether Mr. Wilfong objected in a timely manner, and as a result, disagree on what is the proper standard of review. In reviewing a sentencing decision, this court "must first ensure that the district court committed no significant procedural error" and then consider the "substantive reasonableness of the sentence." *Gall v. United States*, 128 S. Ct. 586, 597 (2007).

Mr. Wilfong argues, cursorily, that the sentencing judge abused his discretion because he (1) based his decision on alleged criminal conduct not resulting in convictions, both pending and previously dismissed charges, (2) did not specify which pending or dismissed charges he relied on, and (3) did not calculate how the criminal conduct not resulting in convictions would affect his criminal history points if counted. Mr. Wilfong does not cite any authority, nor

give any discussion beyond simply listing the ways in which (he believes) the district court abused its discretion. We find that Mr. Wilfong has waived his arguments due to inadequate briefing. *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (internal quotation marks omitted)).

In any event, it is well established that sentencing courts may rely on uncharged conduct within a discretionary sentencing system. *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005). The district court correctly calculated the advisory guidelines range. Because the district judge sentenced the defendant pursuant to his discretion under 18 U.S.C. § 3553(a), and not pursuant to the guidelines, it was not necessary for him to frame his reasoning in terms of criminal history points. We believe that the explanation offered for the above-guidelines sentence was fully adequate to meet the standards of procedural reasonableness, and that the resulting sentence was within the court's ample sentencing discretion.

## IV.  CONCLUSION

We **AFFIRM** the judgment of the district court.