FILED
United States Court of Appeals
Tenth Circuit

January 9, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

v.

ROBERT EVAN PARKER,

   Defendant-Appellant.

No. 07-6239

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:06-CR-00070-F-3)**

Mark Henricksen, Henricksen & Henricksen, Lawyers, Inc., Oklahoma City, Oklahoma.

Scott E. Williams, Assistant United States Attorney (John C. Richter, United States Attorney, with him on the brief), Office of the United States Attorney, Oklahoma City, Oklahoma.

Before **MURPHY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

   This case involves a scheme to sell defective airplane engines. Robert Parker and two co-defendants were accused of improperly overhauling small aircraft engines and falsely representing to customers that the engines met Federal

Aviation Administration requirements. After a jury trial, Parker was convicted on five counts for his role in the scheme—one count for conspiracy, three counts for aiding and abetting or making or using false writings in connection with aircraft parts, and one count for mail fraud. The district court sentenced Parker to 72 months in prison and ordered him to pay $378,633 in restitution.

Parker appeals his conviction with five objections attacking the sufficiency of the evidence, several evidentiary rulings, and the amount of restitution. After carefully reviewing the record and legal authorities, we AFFIRM Parker's conviction and sentence.

## I. Background

Parker was a long-time fan of single-engine aircraft and by the mid-1990s he started to deal with Good Aviation, an airplane mechanic shop which overhauls engines in Washington, Oklahoma. At Good Aviation two technicians, Larry Good and Michael Redpath, held airframe and powerplant (A&P) certificates from the Federal Aviation Administration, allowing them to work on domestic aircraft. Larry Good's son, Allen, also worked in the shop. Allen Good did not have A&P certification, but he did work on overhauling airplane engines, ostensibly under the supervision of either his father or his cousin, Michael Redpath. As early as 1998 Parker engaged Good Aviation to overhaul engines which he would sell to third parties, typically by advertising the engines in a trade journal, Trade-A-Plane.

The superceding indictment alleges a conspiracy between Parker and relevant parties at Good Aviation for the years 2000 through 2002. During that time Good Aviation overhauled approximately 17 engines for Parker. These engines were mostly Lycoming IO-360 engines, which are typically installed in small, home-built aircraft.

Allen Good did the bulk of the engine work for Parker. Each overhauled engine had a logbook describing the overhaul. Because Allen Good did not have A&P certification, either Larry Good or Michael Redpath would sign off on his work in the engine logbooks—the seal of good approval for rebuilt engines. Parker frequently visited Good Aviation to deliver parts for the engine overhauls, and to observe and direct work on the engines.

As part of the overhaul process, Parker was solely responsible for engraving data plates for the engines. Data plates affixed to engines must include information about the precise type and model of engine, especially if an engine is type certified. Good Aviation supplied the data plates and Parker used a local trophy shop to engrave them.

At trial, the government presented evidence regarding ten engines purchased during the conspiracy time-frame.[1] The government also introduced evidence of a few engine sales preceding the conspiracy time-frame. Several

_____

[1] Evidence presented at trial showed Parker sold engines to Mr. Gimple, Mr. Hamilton, Mr. Brown, Mr. Wedman, Mr. Shoop, Mr. Royall, Mr. Peters, Mr. and Mrs. Pryce-Jones, Mr. Kardell, Mr. Stricker, and the Flemings.

mechanics were called and testified in detail about the dysfunctional state of the engines. Victims testified that Parker told them the engines had been properly overhauled. But evidence at trial showed engines with cracks or rusted parts, missing or wrong parts, and other serious problems. Two engines caused in-flight failures and placed the pilots at substantial risk. None of the engines were airworthy and many were never installed in aircraft. Parker frequently sold the engines with an accompanying propeller. In every instance, the propellers were likewise found to be deficient because of cracks or other problems, rendering the propellers useless.

Parker and his co-defendants testified in their own defense. Parker claimed that he relied on logbooks, had no knowledge the repairs were fraudulent, and blamed all the problems with the engines on Good Aviation. The jury returned a conviction for Parker on all counts.

## II. Discussion

Parker challenges his conviction and sentence on five grounds: (1) the district court wrongly admitted evidence of prior bad acts under Federal Rule of Evidence 404(b); (2) insufficient evidence; (3) improper hypothetical questions during cross-examination of Parker's character witnesses; (4) the sentence imposed was procedurally and substantively unreasonable; and (5) the restitution amount failed to provide an offset for the engines' core-value. We address each argument in turn.

*A. Rule 404(b) evidence of sales predating the conspiracy*

Parker first argues the district court erred in admitting evidence of prior

bad acts under Federal Rule of Evidence 404(b) when the government introduced

evidence of engine sales not listed as overt acts in the indictment. We review the

district court's admission of evidence under Rule 404(b) for abuse of discretion.

*United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997). Without

objection at trial we review the admission only for plain error. *United States v.*

*Hill*, 60 F.3d 672, 675 (10th Cir. 1995).

> Federal Rule of Evidence 404(b) provides:
>
> Evidence of other crimes, wrongs, or acts is not admissible to prove
> the character of a person in order to show action in conformity
> therewith. It may, however, be admissible for other purposes, such as
> proof of motive, opportunity, intent, preparation, plan, knowledge,
> identity, or absence of mistake or accident. . . .

In weighing the admissibility of Rule 404(b) evidence, we consider four factors:

(1) whether the evidence is offered for a proper purpose, (2) whether the evidence

is relevant, (3) whether the probative value of the evidence is substantially

outweighed by its prejudicial effect, and (4) whether a limiting instruction is

given if the defendant so requests. *See Huddleston v. United States*, 485 U.S.

681, 691 (1988); *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000).

The standard for satisfying Rule 404(b) admissibility is permissive: "[I]f the

other act evidence is relevant and tends to prove a material fact other than the

defendant's criminal disposition, it is offered for a proper purpose under Rule

404(b) and may be excluded only under Rule 403." *United States v. Tan*, 254

F.3d 1204, 1208 (10th Cir. 2001).

Parker challenges two sets of engine sales admitted under Rule 404(b):

(1) one set of sales during the charged conspiracy time, but not included in the

charged overt acts, and (2) a second set of sales that occurred before the

conspiracy.

*Sales during conspiracy time-frame*

Parker seeks to have three engine sales, which were not listed in the overt

acts section of the indictment, excluded under Rule 404(b). The indictment

charged Parker with conspiracy to make or use false statements in aircraft engine

logbooks during the calendar years 2000 through 2002. The charged conspiracy

covered the sale of unsafe airplane engines with accompanying false

documentation, listing six overt acts, "among others" (R., Vol. 1 at 41 (indictment

¶ 9)), all in violation of 18 U.S.C. § 38(a)(3). Parker challenges three engines

sold during the conspiracy time-frame to Messrs. Kardell[2] and Brown, and the

_____

[2] Parker argues in his Reply Brief that the Kardell transaction should be
counted as outside the charged conspiracy time-frame because the log book was
dated November 1, 1999. The government contends the transaction falls within
the conspiracy because Kardell testified that he dealt with Parker during the 1999
or 2000 time-frame. We analyze the transaction as within the conspiracy, but
note the distinction does not matter. Parker did not object to the Kardell
testimony at trial, and under plain error review, the testimony easily satisfies the
four *Huddleston* factors as permissible Rule 404(b) evidence, for many of the
same reasons the transactions outside the conspiracy time-frame were properly
admitted. Thus the Kardell testimony did not run afoul of Rule 404(b), and even
(continued...)

Flemings, but not listed in the overt acts section. The government argues the transactions are intrinsic to the charged crimes and thus not subject to the Rule 404(b) limitation. We agree.

Rule 404(b) limits evidence of 'other' crimes, wrongs, or acts—not the crime in question. Similarly, "[i]t is well settled that Rule 404(b) does not apply to other act evidence that is intrinsic to the crime charged." *United States v. O'Brien*, 131 F.3d 1428, 1432 (10th Cir. 1997); *see also United States v. Arney*, 248 F.3d 984, 992 (10th Cir. 2001) (discussing Rule 404(b) as not applying to intrinsic evidence). Generally speaking, "[i]ntrinsic evidence is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury. Extrinsic evidence, on the other hand, is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense." Thomas M. DiBiagio, *Intrinsic and Extrinsic Evidence in Federal Criminal Trials: Is the Admission of Collateral Other-Crimes Evidence Disconnected to the Fundamental Right to a Fair Trial*, 47 Syracuse L. Rev. 1229, 1231 (1997). Because Rule 404(b) only limits evidence of 'other' crimes—those extrinsic to the charged crime—evidence

---

[2](...continued)
if it were improperly admitted, the error would be harmless.

of acts or events that are part of the crime itself, or evidence essential to the context of the crime, does not fall under the other crimes limitations of Rule 404(b).

The three transactions within the charged conspiracy time-frame are intrinsic to the crime and substantiate the criminal conspiracy. They directly support the conspiracy charged, namely that Parker made or used false statements in connection with airplane parts and logbooks associated with the sales to Mr. Kardell, Mr. Brown, and the Flemings. These three sales provided direct proof of Parker's involvement with the crimes charged. The sales were not merely contextual, they supported elements of the charged crimes. Rule 404(b) only applies to evidence of 'other' crimes—the transactions were part of the crimes charged, not some other crime.

Accordingly, the district court did not err in admitting the transactions.[3]

*Sales outside the conspiracy time-frame*

The government also introduced two engine sales outside the charged conspiracy time-frame, one to Ms. Pryce-Jones in 1999 and one to Mr. Peters in 1998. Pryce-Jones contacted Parker in 1999 about an advertisement for an airplane engine in Trade-A-Plane, and she and her husband arranged to purchase

---

[3] And, even though Rule 404(b) does not apply, we note that all four parts of the *Huddleston* test are satisfied. When Parker requested a cautionary instruction for Brown's testimony, the district court provided the requested instruction.

the engine. Parker claimed he had overhauled this engine for his own plane, but after deciding to upgrade the horsepower, he could sell the recently overhauled engine. When Pryce-Jones inspected the engine in person, the "exterior looked great" and "everything appeared to be very good." R. Vol., IV at 694. The certified engine came with a logbook indicating it was overhauled in accordance with the manufacturers's instructions. The Pryce-Joneses purchased the engine for $32,000. However, they later discovered multiple problems, including a cracked crankcase, substantial oil leaks, five cracked cylinders, and worn out connecting rods and bushings. Not surprisingly, the engine was not safe for flight.

The engine purchased by Peters involved similar circumstances. Parker advertised the engine in Trade-A-Plane. Parker explained the engine was recently overhauled and just lying around his shop. However, after purchase, an independent mechanic examined the engine and discovered major problems, such as incorrect bolts inside the engine.

Upon reviewing this evidence, we conclude the district court did not commit plain error in admitting the evidence of Parker's engine sales before the charged conspiracy. Both transactions satisfy the four-part *Huddleston* test. First, the government offered Pryce-Jones's testimony for a proper purpose under Rule 404(b) to address Parker's intent and knowledge—both of which Parker disputed at trial. According to Parker, he was merely an innocent seller of

overhauled engines, and all the blame rests on the mechanical work performed by others. But the Pryce-Jones engine sale shows that even when Parker sold an engine overhauled by someone other than Good Aviation, the result was the same: a deficient engine that appeared new on the outside, including a clean logbook, but was not airworthy. Also, Parker requested, and the court gave, a Rule 404(b) cautionary instruction for Ms. Pryce-Jones's testimony.

Second, the government offered the Peters transaction for a proper purpose, and to show Parker's knowledge of the nature and quality of Good Aviation's repair work. This testimony demonstrated Parker's knowledge of the Goods' inadequate repair work and his desire to profit from the sale of shoddy engines. In fact, when challenged with a complaint letter sent to Trade-A-Plane, Parker responded with a highly pertinent letter, blaming Good Aviation for poor engine repairs.

In sum, Parker fails to demonstrate how either engine sale outside the conspiracy time-frame lacked relevance or would have been unduly prejudicial. *United States v. Cuch*, 842 F.2d 1173, 1176 (10th Cir. 1988) ("It is well settled that the rule is one of inclusion which admits evidence of other crimes relevant to an issue in a trial, unless the evidence is introduced for an impermissible purpose or undue prejudice is shown.").

While we conclude the district court did not abuse its discretion in admitting the evidence, any possible error would plainly be harmless. "A

harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *United States v. Resendiz-Patino*, 420 F.3d 1177, 1181 (10th Cir. 2005). Parker does not persuade us the admitted evidence had a substantial influence, or was so influential that we should doubt the jury's verdict.

The district court committed no error, but even if it did, the error would have been harmless.

## B. *Sufficiency of the evidence*

Parker next challenges the sufficiency of the evidence for his conviction on each of five counts. We review sufficiency of the evidence de novo. *United States v. Voss*, 82 F.3d 1521, 1524–25 (10th Cir. 1996). In so doing, we "view[ ] the evidence in the light most favorable to the government" asking whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When conducting this review, "we do not weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002). We also do not review the evidence in "bits and pieces," but we evaluate the sufficiency of the evidence by "consider[ing] the collective inferences to be drawn from the evidence as a whole." *United States v.*

*Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986).  We will only overturn a guilty

verdict on sufficiency grounds if no reasonable juror could have reached such a

verdict on the evidence presented.  *United States v. Shepard*, 396 F.3d 1116, 1119

(10th Cir. 2005).

*Count 1: conspiracy under § 38(a)(3)*

Parker first argues the government failed to provide sufficient evidence that

he engaged in a conspiracy to commit fraud involving aircraft parts.  To obtain a

conviction for conspiracy under 18 U.S.C. 38(a)(3),[4] the government is required

to prove: (1) an agreement with another person to violate the law; (2) knowledge

of the essential objectives of the conspiracy; (3) knowing and voluntary

involvement; and (4) interdependence among the alleged co-conspirators.  *See*

*United States. v. Edwards*, 69 F.3d 419, 430 (10th Cir. 1995) (discussing elements

for conspiracy under 21 U.S.C. § 846).  Participation in a conspiracy can be

---

[4]  18 U.S.C. 38(a) provides in relevant part: "Offenses.–Whoever, in or affecting interstate or foreign commerce, knowingly and with the intent to defraud–
(1) . . .
    (C) makes or uses any materially false writing, entry, certification, document, record, data plate, label, or electronic communication concerning any aircraft or space vehicle part;
. . .

(3) attempts or conspires to commit an offense described in paragraph (1) or (2),

shall be punished as provided in subsection (b)."

proven by either explicit or implicit agreement by the defendant. *See United*

*States v. Rahseparian*, 231 F.3d 1267, 1272 (10th Cir. 2000).

Parker argues "[t]here was insufficient evidence to prove that an agreement

existed among the alleged co-conspirators." Aplt. Br. at 39. In support of this

contention, Parker selects favorable bits and pieces of testimony from his and his

co-defendants' testimony to deny the existence of a conspiracy.[5]

Not every piece of evidence need support the jury's verdict. When we look

at the record as a whole, we find enough evidence to support Parker's conviction.

The evidence shows Parker worked independently of his co-conspirators as a

central figure in the scheme, with full knowledge and intent to defraud the

purchasers of the defective engines. The trial contained testimony of 12

customers, who purchased engines from Parker, and several mechanics, who later

---

[5] Parker also challenges the sufficiency of the evidence supporting the "aviation quality" of the parts. Aplt. Br. 37–39. We reject this challenge. First, Parker claims "aviation quality" is an essential element of the underlying crime of violating 18 U.S.C. § 38(a)(1)(C), but in fact, the aviation quality issue pertains to the penalty provision of the statute, § 38(b)(1), which provides for a greater fine and longer term of imprisonment if the offense "relates to the aviation quality of a part," § 38(b)(1). Aviation quality only relates to the statutory sentencing enhancement. Second, sufficient evidence supports the aviation quality determination of many parts involved in Parker's conspiracy. Third, any error would be harmless because Parker received a sentence less than 10 years, and the aviation quality enhancement operates to increase the standard sentence maximum of 10 years to 15 years. Parker could not have been harmed by the aviation quality portion of the statute.

worked on the engines, for a total of 22 government witnesses indicating the poor quality of the engines.

In each case, the engines sold by Parker included a new logbook that falsely represented the overhaul work done to the engine. A few logbooks even stated that the engine "was in a condition for safe operation." R., Vol. III, at 468. In reality the engines were so inadequate that not a single engine was safe for flight. Three engines actually failed during flight, causing substantial risk to the pilots. The government's first witness, Kardell, testified about the dramatic failure of the engine on the very first take-off that forced an emergency landing.

As one representative example of the defective engine quality, Mr. Stricker, who is also an A&P mechanic, described the numerous deficiencies he found in the engine he purchased from Parker. He testified that the rocker box, valve springs and all four cylinders were covered with rust, vital engine bolts were finger-loose, the crankcase was contaminated with bead-blasting media, the oil pump was defective, other parts were incorrect, one part was missing, cylinders were not honed correctly, the pistons were used, the crankshaft was worn below the maximum allowable specifications and cracked, valves and valve keepers were worn, and the bearings were used. *See* R., Vol. III at 398–404. Deficiencies of similar magnitude were found in trial testimony about each of the engines. As

another clear example, some engines were overhauled with internal parts stamped "not airworthy." *Id.* at 464.

Parker played a central role in marketing and advertising these defective engines. Parker placed the advertisements in Trade-A-Plane, a publication targeted at small airplane enthusiasts, and he gave a similar deceptive sales-pitch to the purchasers.

The engines were overhauled in a way that supports a plan to sell grossly deficient engines as if they were in proper working order. The engines had the external appearance of being properly overhauled. Only when the engine was torn down did the defective nature of the work become apparent. The jury could conclude that Parker, as the salesman of these engines, had full knowledge of their defective state and acted with an intent to defraud the customers. Testimony at trial demonstrated an overwhelming pattern of grossly deficient engines, all sold with pretense of being newly overhauled and in airworthy condition.

To counter this, Parker's defense claimed he was unaware of the deficiencies and was just a mere seller of the engines, who had no intention to profit from selling the dangerously defective engines. Parker also claimed to have stopped selling the deficient engines once he became aware that Good Aviation was producing less than satisfactory overhauls. Substantial evidence at trial contradicted both lines of defense.

First of all, the evidence supported a finding that Parker was more than a mere salesman and played an active role in a conspiracy. Three witnesses testified Parker was present at Good Aviation on multiple occasions and instructed or supervised Allen Good in the overhaul of engines. One witness testified Parker was at Good Aviation more than a dozen times, provided numerous engine parts to the mechanics, was very knowledgeable about the particular types of airplane engines he sold, and observed the engine overhaul process at every stage. One witness testified Parker brought defective parts to Allen Good for use in an engine overhaul. Multiple witnesses supported the claim that Parker was essentially Allen Good's only customer during the time-frame of the conspiracy. The overall weight of the evidence was not consistent with Parker's claim to be an unknowing salesman.

The evidence also supports the jury's conclusion that Parker did not stop selling the engines once he learned about Allen Good's inadequate work. A letter Parker sent to the FAA on July 14, 2002 shows his active role in the scheme. The letter expressly recognized the inadequate nature of the engine overhauling work performed by Good Aviation. Yet Parker continued to sell engines after admitting in the letter that he knew the repairs were inadequate, directly contradicting his testimony that he had stopped selling defective engines.

In addition, throughout the conspiracy Parker personally requested logbooks from Allen Good, and those logbooks contained material false statements relating to the deficiently overhauled engines. This evidence also demonstrates Parker's knowledge and involvement in the conspiracy. In each case the logbook entries falsely stated repair work was done to the overhauled engines. The logbooks contained numerous, materially false statements. Parker alone was responsible for having data plates engraved at a trophy shop and then installed on the engines before sale.

Finally, the jury heard testimony from several customers who contacted Parker about their deficient engines and Parker's refusal to correct any of the problems. This evidence points to Parker's deep involvement in the plan to sell deficient engines, and his desire to profit from the sale by ignoring or refusing to correct the defects after the engines were sold.

In sum based on the entire record, a jury could reasonably conclude that Parker was involved in a conspiracy to commit fraud in connection with airplane parts in violation of 18 U.S.C. § 38(a)(3).

*Counts 2,3,and 4: false statements involving aircraft parts*

Parker argues the government failed to provide sufficient evidence that he aided or abetted, or made or used false statements involving aircraft parts. He was charged under 18 U.S.C. § 38(a)(1)(C), which prohibits making or using a

false writing concerning any aircraft part, and with aiding and abetting violations of the same statute under 18 U.S.C. § 2. The three counts involved three specific engines sold by Parker during the conspiracy time-frame: Count 2 for the Wedman engine; Count 3 for the Shoop engine; and Count 4 for the Royall engine. *See* R., Vol. I. at 19–20; PSR ¶ 21.

To obtain a conviction for violating 18 U.S.C. § 38(a)(1)(C), the government must prove beyond a reasonable doubt that (1) Parker made or used a false writing; (2) he knew the false writing contained a false statement or entry at the time he made or used it; (3) the false writing was material; (4) he made or used the false writing with the intent to defraud; and (5) the false writing concerned aircraft parts in or affecting interstate commerce. *See* 18 U.S.C. § 38(a); *cf.* Tenth Cir. Pattern. Crim. Jury Ins. § 2.46.2 (instruction for 18 U.S.C. § 1001(a)(3)). According to the statute, a false writing can include any "entry, certification, document, record, data plate, label, or electronic communication." 18 U.S.C. 38(a).

The relevant evidence supporting Parker's conviction on these three counts has been discussed in detail above regarding the conspiracy count. The same evidence supports the jury's conclusion that Parker knowingly, with an intent to defraud, either made or used false writing in connection with airplane

parts—namely the logbooks Parker provided to purchasers attesting to the workmanship of the overhauled engines.

In short, a reasonable jury could conclude Parker violated 18 U.S.C. § 38(a)(1)(C).

*Count 5: mail fraud*

Finally, Parker argues the government failed to provide sufficient evidence that he committed mail fraud.

To obtain a conviction for mail fraud under 18 U.S.C. § 1341, the government must prove beyond a reasonable doubt that (1) Parker engaged in a scheme or artifice to defraud customers or obtain money by means of false and fraudulent pretenses, representations or promises; (2) Parker intended to defraud customers, and (3) Parker used the United States mails or a commercial interstate carrier to facilitate that scheme. 18 U.S.C. § 1341; *see United States v. Rahseparian*, 231 F.3d 1267, 1271 (10th Cir. 2000).

The evidence supports Parker's conviction for committing mail fraud. At Parker's request, Mr. Royall sent a $3,000 check to Parker for a down payment through the United States mail. Parker's contention that the mailing was not necessary to carry out the scheme misses the mark. The use of the mail need not be an essential element of the scheme, rather the use of the mail may be "incident to an essential part of the scheme" or "a step in the plot." *Schmuck v. United*

*States*, 489 U.S. 705, 711 (1989) (internal citations omitted). The evidence of Royall mailing a $3,000 check to Parker—a step in the plot to defraud his customers—supports Parker's conviction for committing mail fraud.

C. *Character witness cross-examination*

Parker next challenges the district court's decision to allow the government to ask certain hypothetical questions to three character witnesses.

We review the district court's decision to allow cross-examination questions of character witnesses for abuse of discretion. *See World Wide Ass'n of Specialty Programs v. Pure, Inc.*, 450 F.3d 1132, 1138 (10th Cir. 2006). We review how character evidence "depend[s] on numerous and subtle considerations difficult to detect or appraise from a cold record, and therefore rarely and only on clear showing of prejudicial abuse of discretion will [we] disturb rulings of trial courts on this subject." *Michelson v. United States*, 335 U.S. 469, 480 (1948); *see also SEC v. Peters*, 978 F.2d 1162, 1172 (10th Cir. 1992) (finding exclusion of cross-examination question to character witnesses to be an abuse of discretion).

Under Rule 405, a defendant is entitled in limited circumstances to call witnesses to attest to the defendant's good character and the prosecution may conduct limited cross-examination. Our cases allow the prosecution in a criminal case to ask questions of the 'have you heard' variety when a character witness testifies about personal opinion of the defendant's character, as opposed to

offering testimony limited to the defendant's general reputation in the community. *United States v. Polsinelli*, 649 F.2d 793, 795–96 (10th Cir. 1981). The prosecution may ask a personal opinion witness whether he or she "has heard" the defendant had been sued for fraud and whether that information "would have affected your opinion" of good character. *See Peters*, 978 F.2d at 1168–70 (10th Cir. 1992); *see generally* 1 McCormick on Evidence, § 48 (6th ed. 2006).

Parker called four witnesses to vouch for his character as a matter of personal opinion, and now challenges the prosecution's cross-examination of three of the witnesses. We analyze each witness separately.

First, Mr. Buddy testified to Parker's community reputation and gave a personal opinion, stating, "I think very highly of [Parker], because he's been a true friend to me, and I have seen nothing that would degrade from his position," and he has been "honorable and upright and truthful in every dealing[] I've ever had with him." R., Vol. V, 1119. On cross-examination the government asked Buddy if it would "change your opinion of Mr. Parker if you found out he had been selling aircraft engines through Trade-A-Plane that were unairworthy." R., Vol. V. at 1126. The government also asked "if it became apparent to [Mr. Parker] through complaints from those purchasers that the engines were bad, would it change your opinion of him if you learned that he did not then go ahead

-21-

and contact the other purchasers of the engines to warn them that they might have a defective engine?" *Id.* Neither question assumed Parker's guilt.

Parker objected to the government's cross-examination of Buddy. After extensive argument, the district court concluded that Buddy "expressed a personal opinion of Mr. Parker's character," which did not prohibit the government's cross-examination about hypothetical instances of prior conduct. The rules of evidence did not prohibit the cross-examination as long as the questions did not assume Parker was "convicted of the crimes alleged in this case." R., Vol. VI at 1126.

Second, Mr. Way testified favorably about Parker's reputation. Without objection, the government asked limited cross-examination questions about Way's knowledge of Parker's reputation outside the local community. None of the questions suggest prior bad acts, and we see no reason to find the cross-examination improper or prejudicial.

Third, Mr. Hudson testified about Parker's character saying, "I do have an opinion. I admire him greatly," and "[h]e's a great craftsman." R. Vol., V. at 1140. Without objection, the government cross-examined Hudson about his knowledge of co-defendant Good, as well as asking details about the people Hudson knew concerning Parker's reputation. None of these questions dealt with prior bad acts or assumed Parker's guilt.

In sum, the district court did not abuse its discretion in allowing the limited questioning by the government on cross-examination of Parker's character witnesses. Moreover, given the extensive evidence of guilt, even if the cross-examination was error, it would be harmless.

*D. Parker's sentence*

Parker challenges both the procedural and substantive reasonableness of his sentence. Procedurally, Parker challenges the two-level upward adjustment for a leadership role and the district court's explanation of the § 3553(a) factors. Substantively, he challenges the length of the sentence.

We review sentences for reasonableness by giving deference to the district court under "the familiar abuse-of-discretion standard." *Gall v. United States*, 128 S. Ct. 586, 594 (2007); *see United States v. Smart*, 518 F.3d 800, 805 (10th Cir. 2008) (noting that it is now "well settled that we review a district court's sentencing decisions solely for abuse of discretion"). We address the procedural and substantive reasonableness in turn.

*1. Procedural reasonableness*

Parker makes two arguments of procedural error. First, he challenges the district court's calculation of the sentencing guidelines range and, second, he contends the district court inadequately explained its decision not to depart downward. *See Gall*, 128 S. Ct. at 597 (noting as examples of "significant

-23-

procedural error" a district court's "failing to calculate (or improperly

calculating) the Guidelines range" and "failing to adequately explain the chosen

sentence"); *see also United States v. Romero*, 491 F.3d 1173, 1176 (10th Cir.

2007) (treating defendant's allegation that the district court failed to explain its

reasons for rejecting a below-Guidelines sentence as a claim of procedural

unreasonableness).

*Application of § 3B1.1(c)*

The district court applied United States Sentencing Guidelines (USSG) §

3B1.1(c), finding that Parker played a leadership role. We review the district

court's legal interpretation of the Guidelines de novo and its factual findings for

clear error. *See United States v. Dalton*, 409 F.3d 1247, 1251 (10th Cir. 2005).

The district court heard evidence indicating Parker was the leader and organizer

of the conspiracy, and thus subject to the two-level upward adjustment for his

leadership role.

The Guidelines call for the leadership enhancement "[i]f the defendant was

an organizer, leader, manager, or supervisor." USSG § 3B1.1(c). The Guidelines

commentary to § 3B1.1 suggests factors the sentencing court should consider

when evaluating whether a defendant is an organizer or leader. These factors

include:

> the exercise of decision making authority, the nature of participation
> in the commission of the offense, the recruitment of accomplices, the

claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

USSG § 3B1.1 cmt. n.4; *see also United States v. Suitor*, 253 F.3d 1206, 1210 (10th Cir. 2001) (applying the commentary factors to find leadership or organizer adjustment). To qualify for the adjustment, the defendant need only "have been the organizer, leader, manager, or supervisor of one or more other participants" or have exercised "management responsibility over the property, assets, or activities of a criminal organization."[6] *Id.* cmt. n.2. More than one person involved in a conspiracy can qualify for the enhancement. USSG § 3B1.1 cmt. n.4.

The district court had the benefit of a four-day jury trial, and a number of facts support the court's finding. First, Parker does not dispute that he alone placed advertisements in Trade-A-Plane to sell the engines in the conspiracy. Further, Parker alone explained to each victim why the engines were available for resale as well as representing, falsely, the basic quality of the engines. Parker alone engraved the data plates for the engines, which were a necessary and important element of the scheme. Finally, Parker frequently visited Good

---

[6] We find Parker's characterization of Allen Good as the conspiracy leader unavailing. Although Allen Good participated in the conspiracy by placing defective parts in the engines and obtaining payment from Parker, he was not the leader.

Aviation to check on the status of the engines and to direct the engine overhaul work.

Taken together, these facts are more than sufficient to qualify Parker as a leader or organizer for the § 3B1.1 upward adjustment.

*Failure to explain § 3553(a) factors at sentencing*

Parker makes a procedural challenge by claiming the district court failed to consider, or explain its consideration of, the § 3553(a) sentencing factors. *See Smart*, 518 F.3d at 803 (quoting *Gall*, 128 S. Ct. at 597). Where, as here, a district court imposes a sentence within the range suggested by the Guidelines, § 3553(c) requires the court to provide only a general statement of "the reasons for its imposition of the particular sentence." 18 U.S.C. § 3553(c). We do not require the district court to "recite any magic words to show us that it fulfilled its responsibility" to consider the § 3553(a) factors. *United States v. Sanchez-Juarez*, 446 F.3d 1109, 1115 (10th Cir. 2006) (internal quotations and citations omitted).

The district court judge entertained Parker's sentencing arguments at length and indicated on the record the § 3553(a) factors explaining the reliance on the sentencing range suggested by the Guidelines:

> I conclude that the Section 3553 factors carefully considered and taken together do lead to a result entirely in harmony with the application of the guidelines alone and that there is nothing in the

Section 3553 factors which leads me to a conclusion that a sentence below the bottom of the guidelines range is warranted.

R., Vol. IX at 1632–33. In the absence of any request for a downward departure, when a sentence is within the Guidelines range, nothing more is required.

2. *Substantive reasonableness*

Parker also challenges the substantive reasonableness of his sentence. We review the district court's sentence for reasonableness in light of the § 3553(a) sentencing factors. *See United States v. Hamilton*, 510 F.3d 1209, 1217–18 (10th Cir. 2007) ("In evaluating the substantive reasonableness of a sentence, we ask whether the length of the sentence is reasonable considering the statutory factors delineated in 18 U.S.C. § 3553(a)."). Sentences imposed within a properly calculated Guidelines range are accorded a presumption of substantive reasonableness. *United States v. Hernandez*, 509 F.3d 1290, 1298 (10th Cir. 2007); *see Gall*, 128 S. Ct. at 597 ("If the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness."); *Rita v. United States*, 127 S. Ct. 2456, 2457 (2007). The presumption of reasonableness "is a deferential standard that either the defendant or the government may rebut by demonstrating that the sentence is unreasonable when viewed against the other factors delineated in § 3553(a)." *United States v. Kristl*, 437 F.3d 1050, 1054 (10th Cir. 2006).

Parker makes a perfunctory challenge that his sentence is not reasonable, "considering the factors set out in § 3553(a)." Aplt. Br. at 53. We conclude Parker fails to overcome the presumption of reasonableness. The record supports the district court's sentencing determination as substantively reasonable in light of the charged crimes and the evidence presented at trial.

*E. Restitution*

Finally, Parker challenges the district court's restitution order. We review the legality of a restitution order de novo, the district court's factual findings for clear error, and the amount of restitution for abuse of discretion. *See United States v. Serawop*, 505 F.3d 1112, 1117 (10th Cir. 2007).

The district court ordered Parker to pay $378,633 in restitution pursuant to the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A (MVRA). Under the MVRA, the sentencing court must order a defendant convicted of a felony through fraud or deceit to pay restitution to the victims of the defendant's illegal conduct. *See* 18 U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii). The district court resolves disputes over the proper amount of restitution by the preponderance of the evidence. *See id.* § 3664(e).

Restitution is not intended to "punish defendants or to provide a windfall for crime victims, but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Arutunoff*, 1 F.3d 1112, 1121

(10th Cir. 1993). "The determination of an appropriate restitution amount is by nature an inexact science." *United States v. Teehee*, 893 F.2d 271, 274 (10th Cir. 1990). The MVRA relies on the procedures set forth in 18 U.S.C. § 3664, which directs sentencing courts to "reach an expeditious, reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." *Id.* "A restitution order must be based on actual loss, which the government bears the burden of proving." *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (quoting *United States v. Quarrell*, 310 F.3d 664, 678, 680 (10th Cir. 2002)). While not an exact science, "one logical way to assess the value of the lost property is by its cost to the victim—how much the victim paid for the lost property." *United States v. Wilfong*, No. 07-6214, 2008 WL 5340423 at *6 (10th Cir. Dec. 23, 2008). This method is not the "only reasonable form of valuation," and "[i]n some cases, replacement cost may be more appropriate" method of valuation. *Id.* at *6 n.2.

By comparison, loss calculations under the Guidelines requires the "district court [to] only make a reasonable estimate of the loss," *United States v. Sutton*, 520 F.3d 1259, 1268 (10th Cir. 2008), whereas a restitution order under the MVRA must be based on *actual* loss. *See also* USSG § 2B1.1 app. n.3(c) (discussing that loss calculation "need only make a reasonable estimate of the loss."); *and United States v. Baum*, No. 07-6257 at *14 (10th Cir. 2008) (proposed slip) (discussing intended loss under USSG § 2B1.1 and how "it is an

unsettled question whether intended loss requires knowledge that the loss is a virtual certainly or only knowledge that the loss is probable.").  Because restitution under the MVRA must be for actual loss, awarding restitution for an amount greater than the actual loss constitutes an abuse of discretion.  *See United States v. Serawop*, 505 F.3d 1112, 1124 (10th Cir. 2007).[7]

Parker argues the restitution order miscalculates the actual loss because the district court failed to deduct the core-value (the base value of the engine before overhaul),[8] for the engines sold to victims.  We disagree.  After reviewing the entire record we cannot conclude that the district court abused its discretion in ordering the amount of restitution, nor that it committed clear error in concluding the engines had no off-setting core value.

To challenge the restitution amount, Parker primarily relies on the testimony of Robert DeSpain, who indicated that "according to Lycoming's sheet

---

[7]  Parker also contends the restitution amount increased his offense level under Guidelines § 2B1.1.  The PSR calculated the loss by using the same amount calculated for restitution.  On appeal, Parker focuses exclusively on the imposition of restitution, never challenging the calculation of loss under the Guidelines.  Even if Parker properly raised an objection to the Guidelines calculation, we would affirm since the standard for calculating loss under the Guidelines appears to be more flexible than the standard for imposing restitution, since "loss" under Guidelines § 2B1.1 can be for actual loss or intended loss.  *See* USSG § 2B1.1 app. note 3(A).

[8]  In this case scrap value should not be confused with core-value.  The district court used the phrase "scrap value" to signify that the engines had no residual value, including the core.  In essence, the court concluded the defective engines were worthless.

from the factory, [the core price] is $11,000–or $12,150." R., Vol. III, at 539. Parker uses this evidence to argue the district court should have subtracted a core-value equivalent to $11,000 for each of the engines sold when calculating the restitution amount.

The district court rejected this argument. Relying on the testimony at trial, including testimony of the victims and multiple independent mechanics, the court decided not to "attribute any value to these cores other than scrap value." R., Vol. IX at 1599. Based on facts developed during trial as well as the character of the victims, the district court concluded that the core value argument lacked merit. For four reasons, we agree.

(1) First, Mr. DeSpain's testimony supports the district court's conclusions. Parker construes DeSpain's testimony to stand for the proposition that the victims received a windfall without an offset for the engine core. Even if we assume the core-value for each engine was $11,000, the district court's calculation was not clearly erroneous. DeSpain's evidence only stated that the Lycoming price for a *factory* core was $11,000. At minimum, it would not be clear error to conclude that the Lycoming factory price for a core does not control the price for a core engine in substantially worse shape.

Furthermore, DeSpain testified that if a customer supplies a core engine, a rebuild and overhaul would cost $21,013. DeSpain testified that the price of an

-31-

engine rebuild and overhaul would be $33,163. If any one of Parker's victims wished to simply take their core engine and have it rebuilt, it would cost $21,000—without paying for a new core—to obtain a properly rebuilt engine. Likewise, the purchase of a rebuilt engine—with a new core—would cost more than $33,000. If the district court subtracted the suggested $11,000 'core-value' from the restitution amount of each victim, as advocated by Parker, each victim would carry a substantial, actual loss. The reduced restitution amount would not make the parties whole. Based just on DeSpain's testimony, the district court properly found that the actual loss to the victims was an amount equivalent to the purchase price paid to Parker.

(2)  Other evidence supports the restitution amount. After considering the testimony of victims and government experts, the district court found the engines in fact did not have a core-value, but were essentially in such state of disrepair that they were worthless. For example, Redpath testified he was very concerned that the "cases" of the engines were being welded and not stress-relieved, which would potentially lead to cracking problems. While no evidence explains what precisely comprises the core-value in an airplane engine, oral argument seemed to indicate that the airplane engine "case" is the equivalent of the car engine "block," and provides the basis of the core-value. This specific testimony about serious flaws in the airplane engine cases further supports the finding that the engines sold by Parker did not have the core-value he claimed.

-32-

The district court also found under the unique facts of this case and the types of victims of Parker's fraud, that the victims were not in the position to sell the scrap engine parts. Consistent with the district court's determination of scrap value, the record does not show a single victim to have sold a defective engine for a 'core-value.'

(3) Third, consistent with the district court's factual findings for the restitution order, a few victims did pay other mechanics to make their engines airworthy, at considerable cost. For example, Mrs. Pryce-Jones testified that she had her deficient engine overhauled to proper working condition at an expense "in excess of $30,000." R. Vol. IV, at 702. The evidence shows that an overhaul of the deficient engines to proper working condition would cost as much as the total purchase price paid to Parker.[9] Another victim purchased an engine from Parker for $20,000 but then had to expend approximately $30,000 to put the engine in proper working condition.

(4) Finally, the actual losses suffered by Parker's victims were more than the amounts paid for the deficient engines. For example, the victims were on the hook for travel and shipping expenses related to their purchases, and time and delay in obtaining a functioning engine. As an extreme example, one victim went

_____

[9] Consistent with this testimony at trial, the PSR indicates that Pryce-Jones paid $32,000 for an engine "worth about $1,500" that was supposed to be certified. *See* PSR ¶ 39 Vol. VII, 1254.

-33-

so far as to request restitution for more than $100,000 for losses incurred after Parker sold him a defective engine for $13,000, claiming losses stemming from his inability to complete construction and sell an aircraft with the engine purchased from Parker. While the entirety of this particular victim claim may not be properly added to a restitution amount, the evidence supports the consistent pattern of Parker's victims suffering actual losses in excess of their original purchase price for the deficient airplane engine. *See United States v. Wilfong*, No. 07-6214, 2008 WL 5340423 at *10–11 (10th Cir. Dec. 23, 2008) (discussing how the MVRA for property crimes does not permit consequential damages to be added to the restitution amount).

Given the totality of the evidence, we cannot say it was clear error for the district court to conclude that the engines sold by Parker did not retain a substantial core-value, but were instead essentially worthless. Viewed as a whole, the restitution amount conservatively reflected the actual losses to victims. In this case, the district court's method for determining restitution satisfies the MVRA command to obtain a "reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." 18 U.S.C. § 3664.

We therefore affirm the district court's calculation of the amount of restitution.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM Parker's conviction and sentence.