RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0029p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 20-5876

TIMOTHY WAYNE WELLMAN,

*Defendant-Appellant*.

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:19-cr-00108-1—Gregory F. Van Tatenhove, District Judge.

Argued:  April 20, 2021

Decided and Filed:  February 11, 2022

Before:  GIBBONS, WHITE, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Kent Wicker, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellant.  James T. Chapman, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.  **ON BRIEF:**  Kent Wicker, William H. Brammell, Jr., Kayla M. Campbell, DRESSMAN BENZINGER LA VELLE PSC, Louisville, Kentucky, for Appellant.  James T. Chapman, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

CHAD A. READLER, Circuit Judge.  At first blush, this case has the familiar attributes of a classic bribery scheme:  public officeholders raising money, a lucrative public contract, and suspicious campaign contributions to those officeholders from a company seeking the contract.

Those attributes led federal authorities to open a grand jury probe into bribery allegations against two Lexington City Council members. Along the way, the probe uncovered numerous illegal straw campaign contributions orchestrated by local real estate developer Timothy Wayne Wellman, purportedly as quid pro quo for choosing Wellman's firm to fulfill the public contract. As federal investigators closed in, Wellman falsified documents and cajoled his straw contributors to lie about the fraudulent contribution scheme. That cover up proved worse than the purported underlying crime: federal prosecutors indicted Wellman for falsities and obstruction during the bribery investigation, but never bribery itself. A jury convicted Wellman on all counts.

On appeal, Wellman argues that insufficient evidence supports his convictions because, at most, he obstructed an investigation into violations of Kentucky campaign finance laws, not federal bribery. Wellman also alleges errors in his trial and sentencing. But a reasonable jury could conclude that Wellman corruptly obstructed, influenced, or impeded a federal grand jury proceeding. His other arguments are likewise unavailing. Accordingly, we affirm.

I.

In 2017, the City of Lexington began exploring options for relocating its city offices. A committee of the City Council solicited bids on the project, including one from CRM Companies, a local real estate development firm. Timothy Wayne Wellman functioned as an executive at CRM. While the committee deliberated on the CRM proposal, two City Council members began receiving campaign contributions from CRM employees. These actions prompted federal authorities to empanel a grand jury to investigate whether CRM, through the contributions, was improperly attempting to influence the City Council members in violation of 18 U.S.C. § 666. As relevant here, § 666 prohibits "corruptly giv[ing], offer[ing], or agree[ing] to give anything of value to any person, with intent to influence or reward an agent of an organization or of a State, local or Indian tribal government" that receives more than $10,000 of federal assistance during any one-year period, a violation of which is oftentimes referred to as "federal funds" bribery. 18 U.S.C. § 666(a)(2), (b). The FBI cross-referenced public election contributions data with subpoenaed financial records to confirm the irregular donation trends from CRM employees. About a dozen CRM employees, many of modest means, had made

campaign contributions in thousand-dollar increments and contemporaneously cashed personal checks from Wellman in the same amounts. Agents soon suspected a straw contribution scheme arranged by Wellman and funded by CRM.

FBI agents questioned contributors from CRM about the reimbursement checks from Wellman. Contributors gave a variety of dubious stories to explain why those checks were not illicit reimbursements for political contributions. This "behavior impeding [the] investigation," as it was described by an FBI forensic accountant, prompted prosecutors to open a separate grand jury inquiry into potential obstruction charges against Wellman. When prosecutors haled the contributors before the grand jury, most recanted their prior stories, testifying that Wellman solicited them to lie about the reasons for the reimbursement checks. The grand jury in turn indicted Wellman on 11 federal charges, including obstruction of an official proceeding and aiding and abetting numerous associates to make false statements to the FBI.

At trial, the FBI forensic accountant testified that the goal of the bribery investigation was to "follow the money" and interview straw contributors to "understand the nature of these contributions and the source of the money." Agents detailed how straw contributors systematically lied to the FBI about Wellman's reimbursement checks during their bribery investigation. Later, multiple straw contributors took the stand to explain how Wellman offered to fund their political contributions if they gave money to the councilmen's campaigns and then pressed the contributors to adopt false stories about the reasons for his repayments. These stories ranged from fictional loans to compensation for past services rendered, including property leasing, cleaning, tree-cutting, tax preparation, and website design. To substantiate these stories and create a "paper trail," Wellman fabricated (or asked contributors to fabricate) documents like fake IRS 1099s and invoices.

The jury convicted Wellman on all counts. Wellman was sentenced to a year and a day in prison, a $10,000 fine, and three years of supervised release. The district court applied a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1 but ultimately varied downward based on Wellman's character and service to the community. Wellman timely appealed both his conviction and sentence. While his appeal was pending, Wellman sought to delay his prison report date, a request the Court denied.

II.

Wellman was convicted under 18 U.S.C. § 1512(c)(2) for "corruptly" attempting to "obstruct, influence and impede" an "official proceeding." He contends that insufficient evidence supports his conviction. For purposes of Wellman's conviction, the federal grand jury's investigation into bribery serves as the relevant "official proceeding." *See* 18 U.S.C. § 1515(a)(1)(A). Wellman, however, argues that the FBI quickly realized he had not engaged in bribery, the basis of the federal investigation. Yet rather than close the case and disband any official proceedings, the government, Wellman contends, continued to investigate whether his straw contribution scheme violated Kentucky law, including by having FBI agents question CRM employees about their donations. Both these questions and their answers, Wellman says, related solely to state campaign finance law. And the fact that the FBI already knew Wellman had provided the funds, to his mind, confirms that the FBI's efforts to understand the straw contribution scheme had nothing to do with federal bribery. So, Wellman concludes, to the extent he engaged in any "obstruction," that conduct targeted only an investigation into Kentucky state campaign finance violations, not federal bribery.

A. To evaluate Wellman's sufficiency of the evidence challenge, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Maya*, 966 F.3d 493, 498 (6th Cir. 2020) (quoting *Musacchio v. United States*, 577 U.S. 237, 243 (2016)). In view of this deferential standard, a sufficiency challenge presents a "high bar" for a defendant to overcome on appeal. *United States v. Persaud*, 866 F.3d 371, 379–80 (6th Cir. 2017).

While our general standard for sufficiency challenges to a criminal conviction is well settled, our Circuit has yet to fully craft how that standard should be applied in the setting of sufficiency challenges to convictions under § 1512(c)(2). But other courts, including the Supreme Court, employ a framework that typically utilizes a nexus test for measuring the evidentiary support for obstruction-type offenses. In a nutshell, a nexus requirement is an inquiry into foreseeability. Applied in the § 1512(c)(2) setting, a nexus requirement would serve to limit obstruction liability to cases where the defendant foresaw, or could reasonably foresee,

that his conduct would interfere with an official proceeding. *See United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009).

The Supreme Court has used this framework in analyzing challenges to similar obstruction of justice convictions. One example is *United States v. Aguilar*, 515 U.S. 593 (1995). At issue there was a conviction for violating 18 U.S.C. § 1503, which prohibits "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." 515 U.S. at 598. In interpreting § 1503, the Supreme Court held that a defendant's obstructive behavior must possess some "nexus," or "relationship in time, causation, or logic," with a judicial proceeding. *Id.* at 599. Against that backdrop, *Aguilar* concluded that making a false statement to an agent "who might or might not testify before a grand jury," without more, lacks an adequate nexus to sustain an obstruction conviction. *Id.* at 600. A decade later, in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), the Supreme Court took a similar approach in interpreting 18 U.S.C. § 1512(b), which prohibits "knowingly . . . corruptly persuad[ing] another person" to "withhold a record, document, or other object, from an official proceeding." 18 U.S.C. § 1512(b)(2)(A). In overturning Arthur Andersen's conviction for destroying company documents, the Supreme Court found an absence of a nexus to an official proceeding where Arthur Andersen, in directing its employees to shred documents, did "not have in contemplation any particular official proceeding in which those documents might be material." 544 U.S. at 708.

Although the Supreme Court has yet to address similar issues with respect to conduct charged under § 1512(c)(2), most circuits incorporate a "nexus requirement" into sufficiency challenges to § 1512(c)(2) convictions. *United States v. Young*, 916 F.3d 368, 386 (4th Cir. 2019) (collecting cases). Indeed, every circuit to consider the question has imported *Aguilar*'s nexus requirement into § 1512(c)(2), relying on the parallel statutory language and *Arthur Andersen*'s application of the nexus requirement to another provision of § 1512. *United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015); *accord Young*, 916 F.3d at 386. For our part, we have addressed, but not explicitly adopted, the nexus requirement for § 1512(c)(2) offenses. *See United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (finding a sufficient nexus where the defendant lied to a grand jury, "[a]ssuming *arguendo* that the 'nexus requirement' applies").

Today, with the benefit of our sister circuits' reasoned analysis, we join in applying the nexus requirement to convictions under § 1512(c)(2).

The nexus requirement performs a "hemming function" by limiting criminal liability to defendants who have "notice that [their] wrongful conduct will affect the administration of justice." *United States v. Quattrone*, 441 F.3d 153, 171 (2d Cir. 2006). A person who acts without notice that his conduct will affect an official proceeding, after all, "lacks the requisite intent to obstruct." *Aguilar*, 515 U.S. at 599. And imposing criminal liability in such a case would, in the absence of clear congressional authorization, violate the fundamental tenet that the public receives "fair warning . . . of what the law intends to do." *Id.* at 600 (citation omitted). *But see id.* at 612 (Scalia, J., concurring in part and dissenting in part) (noting that "[t]he Court does not indicate where its 'nexus' requirement is to be found in the words of the statute" and criticizing efforts to "import[] extratextual requirements in order to limit the reach of a federal criminal statute" (emphasis omitted)).

Whether that nexus requirement is satisfied, of course, will depend upon the nature of the evidence presented. On one end of the spectrum are cases in which a defendant "obviously" acts in contemplation of a grand jury proceeding by, for example, falsely testifying before the grand jury itself. *Carson*, 560 F.3d at 584. In those instances, one need not labor to see the relationship between obstructive conduct and an official proceeding. But the nexus analysis may be tougher where a defendant's obstructive conduct is more attenuated from the proceeding in time or purpose, as might happen if a defendant aims to obstruct an official proceeding that has not yet commenced. *See Young*, 916 F.3d at 386–87. And in close cases, we must be careful to avoid conflating obstruction of an official proceeding with obstruction of a mere criminal investigation unconnected with an official proceeding. *See United States v. Sutherland*, 921 F.3d 421, 425–26 (4th Cir. 2019) (citing *United States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013)). To distinguish the two, we look for specific evidence in the record, beyond mere speculation, that a defendant reasonably foresaw an "official proceeding" when he committed obstructive acts. *See Young*, 916 F.3d at 387. If the evidence reveals that a defendant acted with awareness "that he was the target of an investigation" and that "the government might be trying to build a case against [him]," the nexus requirement is satisfied. *United States v. Perisco*,

645 F.3d 85, 108 (2d Cir. 2011); *see United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014).

B.    Applying these nexus principles to today's dispute, we conclude that, on balance, there was sufficient evidence for a reasonable juror to conclude that Wellman, at the time of his obstruction, understood he was the target of an FBI investigation and that the government was building a case against him. For example, straw contributor Tommy Sikes testified that Wellman suggested he lie to the FBI because "they're looking at me for campaign violations." Straw contributor Kathye Hollopeter was told by Wellman that he wanted to create more of a "paper trail" to bolster his false stories. To do so, Wellman cashed purported loan-repayment checks from Hollopeter days before the grand jury convened. Straw contributor William "Buddy" Stone testified that *after* he talked to the FBI, Wellman asked him to sign a document falsely stating that he had borrowed $1,000 from Wellman as a personal loan. Finally, Wellman coached straw contributor Veronica Saylor to say that the reimbursements she received from him were for tax preparation services, a story Wellman sought to bolster by providing Saylor with a false IRS 1099 form *after* FBI agents had spoken with her. From this evidence, the jury could conclude that Wellman foresaw he would be the subject of an official proceeding when he committed his obstructive acts.

In many respects, Wellman's case parallels *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). There, the defendants destroyed evidence after realizing that the FBI had begun to interview "straw buyers" intertwined in the defendants' fraudulent life-insurance scheme. *Id.* at 588. The Second Circuit concluded that the defendants' destruction of "documents relevant to a massive fraud" upon learning that the FBI was investigating the fraud provided an adequate basis to find that the defendants' conduct "had 'the natural and probable effect of interfering with a judicial or grand jury proceeding.'" *Id.* at 591 (quoting *Quattrone*, 441 F.3d at 171). So too here.

Wellman's counterarguments largely dispute the foreseeability of the *outcome* of the investigation—that no federal bribery charges resulted—or the *purpose* of the investigation—speculation about the FBI's true motive. Neither argument can overcome the evidence of Wellman's corrupt intent. With respect to foreseeability, it bears reminding that Wellman need

not have known an official proceeding was ongoing, just that it was foreseeable his conduct would interfere with one. *See* 18 U.S.C. § 1512(f)(1); *Phillips*, 583 F.3d at 1264. Nor, for that matter, need Wellman have known that the official proceeding was a federal (as opposed to a state) proceeding. 18 U.S.C. § 1512(g)(1); *United States v. Mathis*, 932 F.3d 242, 263 (4th Cir. 2019) (noting that § 1512(g)(1)'s text "plainly refutes" the notion that the government must prove the defendant "contemplated an official proceeding that was federal in nature"). And the obstruction offenses here do not require completion of the underlying offense as an element of the crime. § 1512(c)(2); *see also Mathis*, 932 F.3d at 261. It follows that the government need not prove Wellman's knowledge of the investigation's purpose or outcome. Any other rule, it seems, would create the perverse incentive for defendants to obstruct justice more proficiently.

As to purpose, Wellman is of the view that the government was investigating potential violations of state, not federal, law. The evidence, however, tells a different story. As part of a federal grand jury investigation into federal funds bribery, the FBI interviewed Wellman's straw contributors to determine whether they had acted independently or on Wellman's behalf. During those interviews, agents witnessed what "appeared to be obstructive behavior," which prompted the government to open an obstruction case. Still, the federal funds bribery investigation continued. As an FBI forensic accountant testified, the § 666 and obstruction inquires proceeded "[i]n parallel." Accordingly, the jury could find that Wellman obstructed an official proceeding into potential violations of federal law.

III.

Wellman next asserts that insufficient evidence supports his convictions for aiding and abetting false statements under 18 U.S.C. §§ 2, 1001(a). A false statements conviction is proper if Wellman knowingly and willfully "aid[ed], abet[ted], counsel[ed], command[ed], induce[d] or procure[d]" statements that were (1) false, fictitious, or fraudulent; (2) material; and (3) pertained to "any matter within the jurisdiction of the executive . . . branch of the Government of the United States." 18 U.S.C. §§ 2, 1001(a). On appeal, Wellman alleges that his statements (1) fail to meet the materiality element; (2) fail to meet the jurisdictional element; and (3) fail on factual sufficiency grounds on Counts 2, 6, and 8. We affirm his convictions.

A.    A reasonable jury could conclude that the falsehoods Wellman procured were material to the government's bribery investigation.  The materiality requirement presents "a fairly low bar for the government to meet." *United States v. White*, 270 F.3d 356, 365 (6th Cir. 2001).  A "false declaration satisfies the materiality requirement if a truthful statement might have assisted or influenced the . . . investigation." *United States v. Lee*, 359 F.3d 412, 417 (6th Cir. 2004) (citation omitted).  But federal agents need not have been influenced by a false statement for that statement to be material.  *United States v. Lutz*, 154 F.3d 581, 588 (6th Cir. 1998).

Wellman's procured falsities about the straw contribution scheme were material to the FBI's bribery investigation.  The stated goal of the investigation was to "follow the money" and ascertain the true nature of the campaign contributions to reveal whether any bribery of public officials took place.  And truthful statements about the transfers of money and the reasons for those transfers would have assisted that investigation.

Whether Wellman's falsities fell within the realm of information already known to the FBI is irrelevant to the materiality inquiry.  *See United States v. LeMaster*, 54 F.3d 1224, 1230–31 (6th Cir. 1995).  Statements aimed at misdirecting agents and their investigation satisfy the materiality requirement of § 1001 "even if they miss spectacularly or stand absolutely no chance of succeeding."  *United States v. Lupton*, 620 F.3d 790, 806–07 (7th Cir. 2010).  After all, it would be odd, to say the least, "to excuse a defendant's deliberate prevarication merely because his interrogators were a step ahead of him."  *United States v. Mehanna*, 735 F.3d 32, 55 (1st Cir. 2013).

Resisting this conclusion, Wellman contends that each straw contributor truthfully admitted that Wellman was the *source* of the reimbursed funds, and that Wellman's procured lies related only to the *reasons* for each reimbursement—a fact immaterial to all but potential violations of Kentucky campaign finance laws.  But even operating from the baseline assumption that Wellman's conduct violated state law, the FBI had cause to delve deeper because Wellman's intent in funneling straw contributions to the councilmen was a central focus of the FBI's bribery investigation.  *See LeMaster*, 54 F.3d at 1230 (concluding that false statements were material where "[a state legislator's] receipt of cash and his reason for accepting it were the very core of

the FBI's investigation"). Logically, the FBI could ask why Wellman would devise a straw contribution scheme with corrupt intent to hide a large, illicit donation from his own pocket. At least one possibility would be to increase the likelihood of quid pro quo bribery. *See United States v. Terry*, 707 F.3d 607, 613–14 (6th Cir. 2013). Unsurprisingly, the FBI could conclude the same. Conversely, if each straw contributor made campaign contributions on his or her own accord and merely sought, in good faith, a supporting loan that Wellman willingly obliged, the prospect of unearthing an illegal bribery scheme would appear dimmer. In short, the jury had an adequate basis to conclude that statements obfuscating Wellman's true intent in arranging straw contributions were material to the FBI's bribery investigation.

B. Wellman's procured false statements also satisfy the jurisdictional element of his convictions under § 1001(a)(2). The Supreme Court has instructed that "the term 'jurisdiction' should not be given a narrow or technical meaning for purposes of § 1001" and that jurisdiction is satisfied if the federal government "has the power to exercise authority in a particular situation." *United States v. Rodgers*, 466 U.S. 475, 479–82 (1984). Statements made to the FBI during a federal criminal investigation easily qualify. *Id.* Knowledge that an incriminating statement falls within federal jurisdiction is not required. *United States v. Yermian*, 468 U.S. 63, 68–69 (1984).

Wellman's procured false statements to FBI investigators fall under § 1001's wide umbrella. Even if the straw contribution scheme itself did not violate federal law, Wellman concealed it from the FBI's legitimate investigation into federal funds bribery. To be sure, had Wellman's falsities been made directly to state officers on a matter of exclusive state jurisdiction, he may have had a compelling argument for reversal. *See United States v. Ford*, 639 F.3d 718, 720–22 (6th Cir. 2011). But that was not the case. Wellman's jurisdictional argument thus misses its mark.

C. Finally, Wellman argues that insufficient evidence supports Counts 2 (Jeff Collins), 6 (Tom Nash), and 8 (Tom LeMaster) because each individual denied at trial that Wellman encouraged him to lie to the FBI. Yet other evidence exists from which the jury could conclude that Wellman procured their lies.

Collins testified at trial that Wellman's reimbursement check was "for leasing condos" and that Wellman never told him to lie to the FBI. But Wellman gave the $1,000 check to Collins around the same time that Collins made a $1,000 political contribution. The two later had a "discussion" in which Wellman "let[] [Collins] know" the check was for leasing, indicating that Wellman cooked up the leasing story for Collins to share. In a similar vein, the jury heard that Collins's trial testimony about both the reason for the reimbursement and Wellman's apparent desire to want him to stick to the condo leasing story contradicted his prior testimony before the grand jury. This inconsistency further supports the conclusion that Collins lied to the FBI at Wellman's behest, contrary to Collins's trial testimony.

Nash testified truthfully at trial that Wellman asked him to be a straw contributor and that each reimbursement check was for his political contribution. But that story conflicted with what he previously told the FBI: that each check was money owed for a "real estate deal" on a Florida condominium. When confronted with this contradiction at trial, Nash variously claimed not to remember his prior statements or that it was his idea, not Wellman's, to use the real estate debt to justify the reimbursement. A jury could conclude from this contradiction that Nash lied to the FBI, and that Wellman caused that lie. Nash, notably, shared the real estate story only after talking to Wellman. The prospect that Wellman convinced Nash to lie is buttressed by Nash's testimony that Wellman angrily exclaimed "I knew you didn't have the balls" when Nash said he planned to plead the Fifth at trial. And Nash resigned shortly before trial after almost 20 years at CRM following a conversation about "what [he] was going to do" at trial, further suggesting that Wellman procured Nash's falsehoods.

Finally, LeMaster first told the FBI that Wellman's $1,000 check was payment for a side job cutting trees. But LeMaster later recounted how Wellman offered to loan him $1,000 to make a political contribution. Upon asking Wellman "What am I supposed to say if people asked me where I got this money?," Wellman replied, "Just tell them the truth. . . . [Y]ou work for me, don't you?" LeMaster admitted that Wellman's tree-cutting story "was in [his] mind" when he gave that story to the FBI and that he gave the story even though he was not owed any money for tree-cutting services. True, LeMaster testified at trial that "[n]obody" suggested that he lie to the FBI. Yet notwithstanding LeMaster's denials, a jury could find that Wellman's

wink and nod to "tell them the truth" amounted to Wellman knowingly soliciting lies. Reinforcing the point, FBI agents described how LeMaster changed his story after being confronted with the potential criminal consequences of lying to the FBI.

The context in which Collins, Nash, and LeMaster lied also points to Wellman's involvement. For one, the evidence showed a pattern of Wellman procuring false statements from straw contributors who then lied at Wellman's request about the reason for the payments. For another, the government proved a tight temporal proximity between the campaign contributions and Wellman's reimbursements, indicating these checks were illicit reimbursements even if Collins, Nash, and LeMaster offered contrary explanations. Finally, evidence of Wellman's close relationships with these witnesses—including Nash's statement to the jury, "I trust him with my life"—suggests they had motive to lie to the FBI to protect Wellman. Adding in evidence of pattern and temporal proximity, the record at trial sufficiently demonstrated Wellman's knowing procurement of false statements.

IV.

Wellman next contends that the government engaged in prosecutorial misconduct by (1) threatening to charge witness Liz Stormbringer with perjury and (2) implying that Wellman had the burden of proof during closing statements. As Wellman raised both arguments in motions for a mistrial, we review for abuse of discretion. *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010).

A. Wellman's first misconduct claim is grounded in due process. The right to due process "precludes prosecutors . . . from improperly threatening witnesses with perjury prosecution." *United States v. Stuart*, 507 F.3d 391, 398 (6th Cir. 2007) (citing *Webb v. Texas*, 409 U.S. 95, 97–98 (1972) (per curiam)). In light of the ramifications of false testimony, however, "merely warning a witness of the consequences of perjury" does not "demand[] reversal." *Id*. (quoting *United States v. Pierce*, 62 F.3d 818, 832 (6th Cir. 1995)). To the contrary, "in many circumstances, warning a witness about the possibility and consequences of perjury charges is warranted." *United States v. Hernandez-Escobar*, 911 F.3d 952, 959–60 (9th Cir. 2018) (citation omitted). Indeed, we have recognized that the government may have an

affirmative duty to warn of perjury's risks where a witness lacks representation. *Stuart*, 507 F.3d at 398. What is more, dissuading witnesses from committing perjury preserves the legitimacy of verdicts that rest on their testimony and bolsters public confidence in the judicial system. *See United States v. Alvarez*, 567 U.S. 709, 720–21 (2012) (plurality opinion). For these reasons, to establish that a witness was "improperly threaten[ed]," a defendant must show that (1) the government substantially interfered with the "witness's free and unhampered determination to testify," and (2) any error was not harmless. *Stuart*, 507 F.3d at 398 (quoting *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997)).

Liz Stormbringer was a straw contributor the government called to testify at trial as a hostile witness. During her testimony, Stormbringer contradicted aspects of her grand jury testimony in which she had incriminated Wellman. Following that testimony, the lead prosecutor, during a bench conference with the defense and Stormbringer's own counsel, indicated that a Fifth Amendment colloquy "might" be necessary because the prosecutor had "a provable perjury case" against Stormbringer in light of her contradictory testimony. Stormbringer's counsel asked for a brief recess to advise Stormbringer of her rights. After this private discussion, Stormbringer returned to the stand and "clarif[ied]" her previous testimony to conform to her grand jury testimony.

On this record, the prosecutor did not substantially interfere with Stormbringer's ability to testify freely. As a factual matter, the prosecutor pointed out a plain contradiction in the sworn testimony given by Stormbringer, a quintessential example of perjury. And as a functional matter, prosecutors assured Stormbringer's counsel they would consider perjury charges regardless of whether she changed her testimony or decided to "take the Fifth," meaning Stormbringer had less to gain from later changing her testimony. What is more, Stormbringer's own counsel warned her about possible perjury, insulating her from direct government coercion. *See id.* at 399; *United States v. Serrano*, 406 F.3d 1208, 1216 (10th Cir. 2005) ("The potential for unconstitutional coercion by a *government actor* significantly diminishes, however, if a defendant's witness elects not to testify after consulting an independent attorney." (emphasis in original) (citation omitted)).

The bench-conference warning here contrasts sharply with unconstitutional attempts at intimidation and ex parte threats by prosecutors or their agents in other cases. *See, e.g.*, *Foster*, 128 F.3d at 953–54; *United States v. Thomas*, 488 F.2d 334, 336 (6th Cir. 1973) (per curiam). And even if the prosecutor's conduct amounted to coercion, there is nothing to suggest this isolated event can clear the harmless-error hurdle. There was thus no error by the district court in denying Wellman's motion for a mistrial on this ground.

B. Wellman also argues that a prosecution statement during closing argument warrants a new trial. Here, Wellman invokes his rights protected by the Fifth Amendment, which "forbids . . . comment by the prosecution on the accused's silence." *Griffin v. California*, 380 U.S. 609, 615 (1965). Nor may the prosecution indirectly comment on the accused's silence by suggesting that the defendant must produce evidence to prove his innocence. *See Wogenstahl v. Mitchell*, 668 F.3d 307, 332 (6th Cir. 2012). Yet Wellman alleges that is exactly what happened during closing argument when prosecutors alluded to the omission of a fake loan document referenced at trial:

> Prosecutor:    But then when Wellman called [Buddy Stone] in, after he had heard what Buddy had done, he tried to correct the damage or limit the damage by asking Buddy to sign a false statement saying it was a loan. Now, *we never saw that statement. They decided not to bring it out, but it is part of the conduct . . . .*

R. 85, PageID##1313–14 (emphasis added).

Contrary to Wellman's assertion, there was nothing improper about the prosecutor's statement. Prosecutors are "entitled to point out the lack of evidence supporting" a theory—namely, that Wellman's dealings with CRM employees were all above board. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005). And they have especially "wide latitude" to do so during closing argument. *United States v. Boyd*, 640 F.3d 657, 669 (6th Cir. 2011) (citation omitted).

Nor, in any event, was the remark so "flagrant" as to require a new trial, even assuming the remark was improper. *United States v. Kuehne*, 547 F.3d 667, 688 (6th Cir. 2008). The prosecutor's use of the collective "they"—a likely reference to the defense team as a whole, not Wellman individually—mitigated any potential harm. And the prosecution's immediate

reminder that "the defense has no burden to introduce everything," a point bolstered by the district court's parallel jury instructions, further allayed any risk of prejudice. *See United States v. Joiner*, 727 F. App'x 821, 826 (6th Cir. 2018) (first citing *United States v. Henry*, 545 F.3d 367, 382 (6th Cir. 2008); and then citing *United States v. Clark*, 982 F.2d 965, 968–69 (6th Cir. 1993)). Viewed in the context of the entire trial, this isolated statement does not warrant a new trial.

With neither instance of prosecutorial misconduct warranting a new trial on its own, Wellman asserts they can succeed together. But Wellman's further claim of "cumulative error fails for want of error." *United States v. Ledbetter*, 929 F.3d 338, 365 (6th Cir. 2019).

V.

Turning from his conviction to his sentence, Wellman contends that the district court imposed a procedurally unreasonable sentence when it applied a two-level obstruction of justice enhancement under U.S.S.G. § 3C1.1. Section 3C1.1 provides a two-level enhancement if "the defendant willfully obstructed or impeded . . . the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1. In view of Wellman's conviction for obstruction, a § 3C1.1 enhancement is appropriate if Wellman committed *further* obstruction during his underlying prosecution for obstruction. *See Carson*, 560 F.3d at 589.

We will assume, for sake of argument, that this mixed question of fact and law is reviewed de novo. *See United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019) (noting that "our court has sent mixed messages on the standard of review" where a district court applies § 3C1.1 to a particular set of facts, with some cases reviewing de novo, others for clear error, and a few incorporating elements from both standards). Yet even under fresh review, Wellman's efforts to pay off the truck lease of Amanda Hicks's husband amounted to further obstruction of Wellman's obstruction prosecution. Hicks, a CRM accountant, was another straw contributor for Wellman. She testified that, upon learning of the FBI's investigation, she discussed with Wellman her concerns that the FBI might interview her about Wellman's reimbursement checks. Wellman told her to say the money was an unrelated personal loan. To document that

understanding, Hicks, following her conversation with Wellman, wrote Wellman checks for the $3,000 she purportedly had "borrowed," which Wellman then cashed days before Hicks's grand jury testimony. After testifying, Hicks asked Wellman to reimburse her for the $3,000 she had paid for the phony loan. Wellman agreed. But he worried that repaying Hicks directly would expose his false story about the loan. To cover his tracks, Wellman paid $3,000 towards Hicks's husband's truck loan. That payment, made about two months after Wellman's indictment on obstruction charges, constitutes further obstruction for purposes of § 3C1.1. *See Carson*, 560 F.3d at 589 (citing § 3C1.1 cmt. n.7).

Nor did the district court err by crediting Hicks's testimony over Wellman's when Wellman denied at sentencing that the conduct alleged in the presentence report occurred. Wellman's arguments on this front speak to credibility issues and factual findings, which we review only for clear error. *See United States v. Gillespie*, 713 F. App'x 471, 474 (6th Cir. 2017) (citing *United States v. Taylor*, 956 F.2d 572, 576 (6th Cir. 1992) (en banc)). Wellman cannot satisfy that onerous standard. For when, as here, the district court identifies two competing permissible versions of the facts and reasonably explains why it chose to credit one version over the other, such a finding is not "clearly erroneous." *See United States v. Gilliam-French*, 692 F. App'x 270, 273 (6th Cir. 2017) (citing *United States v. Ivy*, 165 F.3d 397, 401–02 (6th Cir. 1998)). And, as the district court noted, Wellman provides no corroborating evidence to support his testimony or otherwise tip the scales in his favor. We thus have no basis to conclude that the district court erred in finding that the facts occurred as Hicks described them.

Wellman's final argument is that the district court engaged in impermissible double-counting. That category of error occurs if "precisely the same" conduct supports the underlying offense and an enhancement. *United States v. Sabino*, 307 F.3d 446, 450 (6th Cir. 2002) (citation omitted). By the same token, "[n]o double counting occurs if the defendant is punished for distinct aspects of his conduct." *United States v. Walters*, 775 F.3d 778, 782 (6th Cir. 2015) (citation omitted). Here, distinct conduct supports Wellman's underlying obstruction offense and the § 3C1.1 enhancement—paying off Hicks's husband's truck loan obstructed the prosecution of Wellman's obstruction offense; it did not obstruct the grand jury's investigation into bribery, the conduct comprising Wellman's underlying offense. Because Wellman's

conviction and enhancement arose from distinct conduct, Wellman's double-counting argument fails.

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.