NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0390n.06

Nos. 22-3301/3697

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 21, 2023
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| TANDRE BUCHANAN, JR., | ) ) ) | |
| Defendant-Appellant. | ) ) | OPINION |

**Before: CLAY, McKEAGUE, and STRANCH, Circuit Judges.**

STRANCH, J., delivered the opinion of the court in which CLAY, J., joined, and McKEAGUE, J., joined in part. McKEAGUE, J. (pp. 21–23), delivered a separate opinion concurring in part and dissenting in part.

**JANE B. STRANCH, Circuit Judge.** In May 2020, Defendant Tandre Buchanan, Jr. participated in rioting and looting in Downtown Cleveland in the wake of George Floyd's murder. He smashed the window of a local bakery, then grabbed a chair from inside and used it to smash another window—creating openings that others used to loot the store while the owner and her employees were locked in the store's bathroom. A jury convicted Buchanan on one count of Hobbs Act Robbery and aiding and abetting the same and one count of tampering with evidence. The district court sentenced Buchanan to 48 months' imprisonment and ordered him to pay restitution. On appeal, Buchanan challenges the judgment and the restitution order. Because the evidence was sufficient to convict Buchanan on both counts, we **AFFIRM** the district court's judgment.

Because the district court's restitution order is based on speculative lost profits, we **VACATE** its restitution order and **REMAND** for a recalculation consistent with this opinion.

## I.  BACKGROUND

### A. Factual Background

On May 30, 2020, Tandre Buchanan joined crowds of people in Downtown Cleveland to protest the murder of George Floyd by a Minneapolis police officer.  The protests did not remain peaceful—rioting, looting, and property destruction ensued.

As the protests spread and turned violent, business owner Kelly Kandah and several of her employees were inside Colossal Cupcakes, a small bakery on Euclid Avenue.  A rioter threw an object and damaged one of the store's large front windows.  Kandah was at the front of the store, while her employees were standing further back behind a counter.  Hoping to avoid injury, Kandah attempted to alert the rioters to their presence, but a cinder block was thrown back in response.  Buchanan, clothed in a bright orange sweatshirt, shoes, and durag, proceeded to break the already-damaged window and was the first person to enter the store.  In Kandah's presence, Buchanan grabbed one of the store's chairs, exited, and smashed a second storefront window.  Buchanan dropped the chair on the sidewalk and walked away while other rioters streamed into the store through the openings.

Meanwhile, Kandah and her employees locked themselves in the store's bathroom and called emergency services.  They could hear "cheering" and "chanting" in the store, and rioters pounded on the bathroom door.  Within approximately 10 minutes, Cleveland SWAT team members arrived at Colossal Cupcakes and escorted Kandah and company out of the store.  The store had been "ransacked"; an employee testified that she was in "complete disbelief" when she walked out of the bathroom because the store "had just been destroyed in a matter of minutes."  Amidst the destruction, Kandah noticed "stuff was just taken," including five computer tablets,

other electronic equipment, and cupcakes. The bakery remained exposed to the public for 11 hours. All told, approximately $280,000 of store property was stolen.

On June 8, 2020, the FBI issued a press release requesting information on persons of interest in connection with the May 30 riots. The release included two photos of Buchanan from May 30: one featured Buchanan in the act of smashing Colossal Cupcakes' storefront window with the chair and the other showed him posing on a sidewalk with a deer head taken from a sporting goods store. Within 15 minutes, Buchanan was identified, and the FBI confirmed his identity through a driver's license search and his personal Instagram account, which featured a picture of Buchanan wearing the orange sweatshirt. Within an hour of the press release, Buchanan restricted his Instagram profile from public access to private access.

The FBI arrested Buchanan and executed a search warrant at his residence on June 10. Investigators were unable to find the orange clothing worn by Buchanan on May 30; he later told investigators that he had disposed of it. After receiving consent, investigators searched Buchanan's phone, which contained videos and messages related to the riots, including messages where Buchanan said he "was giving [cupcakes] out" and showed his awareness that Kandah was in the store when he smashed the first window.

### B.    Judicial Proceedings

On July 23, a federal grand jury indicted Buchanan on one count of Hobbs Act Robbery and aiding and abetting the same in violation of 18 U.S.C. § 1951(a) and § 2 and one count of tampering with evidence with intent to impair an object's integrity and availability for use in an official proceeding in violation of 18 U.S.C. § 1512(c)(1). The Hobbs Act Robbery charge was limited to Buchanan's conduct at Colossal Cupcakes, and the tampering with evidence charge was related to Buchanan's disposal of the orange clothing he was wearing that day.

At trial, the Government introduced evidence related to Buchanan's charged conduct at Colossal Cupcakes and evidence related to other uncharged conduct at other establishments that day. The district court admitted the latter evidence over Buchanan's objection. At the close of both parties' cases, Buchanan moved for judgment of acquittal on both counts under Federal Rule of Criminal Procedure 29, but the district court denied the motion. The jury convicted Buchanan on both counts.

The district court sentenced Buchanan to 48 months' imprisonment and, at a later hearing, ordered him to pay $228,887.61 in restitution, of which $189,796 represented lost profits for the four-month period Colossal Cupcakes was closed for repairs.

Buchanan timely appealed both the district court's judgment and subsequent restitution order, and this court granted his motion to consolidate the appeals.

## II.    ANALYSIS

On appeal, Buchanan argues that the district court erred in (1) denying his motion for judgment of acquittal because the Government presented insufficient evidence on both counts; (2) admitting evidence that he vandalized or looted three other businesses on May 30; and (3) awarding restitution for the bakery's lost profits. We take each issue in turn.

### A.    Sufficiency of the Evidence

Buchanan moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on both counts of the indictment; the district court denied the motion, finding that the evidence was sufficient for a jury to convict him on both counts. We review challenges to the sufficiency of the evidence de novo, considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Kennedy*, 714 F.3d 951, 956-57 (6th Cir.

2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We do not "'weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury.'" *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (quoting *United States v. M/G Transp. Servs., Inc.*, 173 F.3d 584, 588-89 (6th Cir. 1999)).

1.    Count 1: Hobbs Act Robbery

The jury convicted Buchanan on the first count of the indictment, which charged him with committing, and aiding and abetting others in committing, Hobbs Act Robbery of Colossal Cupcakes. Hobbs Act Robbery has two elements: (1) the substantive criminal act, which in this case is robbery, and (2) interference with interstate commerce, which is not at issue here. *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). The Hobbs Act defines robbery as:

> [T]he unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual of threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of . . . anyone in his company at the time of the taking or obtaining.

18 U.S.C. § 1951(b)(1). The verdict form did not distinguish between Buchanan's liability as a principal and his liability as an aider and abettor because the liability is the same under either theory. *See* 18 U.S.C. § 2(a). Buchanan argues that the evidence was insufficient to convict him under either theory.

a.    *Buchanan's Liability as a Principal*

Buchanan argues that the Government's evidence was insufficient to convict him for Hobbs Act Robbery as a principal because the evidence (1) did not show that Buchanan took any property from Colossal Cupcakes while Kandah and her employees were present and (2) did not show that he "committed some violent act or that he threatened violence."

Buchanan maintains that he did not take *anything* from Colossal Cupcakes while Kandah and her employees were present. But the video evidence corroborates Kandah's testimony that Buchanan entered the store and took a chair, which he used to smash the second storefront window. Buchanan does not address his taking of the chair, and he did not raise a defense that he did not intend to deprive Colossal Cupcakes of the chair because he left it on the sidewalk—likely because, under the plain language of the statute, such a defense does not exist.[1] The Government's evidence was sufficient to show that Buchanan unlawfully took the chair from Colossal Cupcakes in the presence of Kandah.

Buchanan's second objection is that the Government proved Kandah was in fear but failed to prove he committed or threatened a violent act, relying on our holding in *United States v. Gooch* that Hobbs Act Robbery is a crime of violence under 18 U.S.C. § 924(c)(3). *See* 850 F.3d 285, 292 (6th Cir. 2017). Buchanan argues that breaking a window outside the store and then briefly entering it is not an act of violence or a threat of violence. While *Gooch* rejected the argument that "one could commit Hobbs Act robbery by 'putting the victim in fear of injury' without violence or the threat of violence," it does not support Buchanan's argument that breaking a window is not an act of violence. *Id.* at 291-92. *Gooch* held only that Hobbs Act Robbery has as an element the use, attempted use, or threatened use of force and thus constitutes a crime of violence. *Id.* The statute's plain language requires a taking "by means of actual of threatened force, *or* violence, *or* fear of injury, immediate or future," to the person or their property. 18 U.S.C. § 1951(b)(1) (emphasis added). The evidence here is sufficient to show that Buchanan

---

[1] Under the federal carjacking statute, 18 U.S.C. § 2119, which also requires the taking of property from the person or presence of another, we have held that "an intent to permanently deprive [is not] an element of the offense." *United States v. Moore*, 73 F.3d 666, 669 (6th Cir. 1996). Rather, "'[t]aking' property as defined under the federal robbery statutes is simply the acquisition by the robber of possession, dominion or control of the property for some period of time." *Id. Accord United States v. Wright*, 246 F.3d 1123, 1126 (8th Cir. 2001).

used force to effectuate the unlawful taking of property when he punched and kicked the first window to break it and enter the store, a violent action that reasonably put Kandah in fear of injury.

In sum, the Government's evidence was sufficient for a reasonable jury to find that Buchanan was guilty of Hobbs Act Robbery as a principal.

b.        *Buchanan's Liability as an Aider and Abettor*

Buchanan argues that the evidence was insufficient to find him liable as an aider and abettor because it did not show that he "specifically intended to help others commit Hobbs Act robbery."

A defendant aids and abets if he "(1) takes an affirmative act in furtherance of [an] offense, (2) with the intent of facilitating the offense's commission," *Rosemond v. United States*, 572 U.S. 65, 71 (2014), and is punishable as a principal, 18 U.S.C. § 2(a).  Regarding the affirmative act requirement, "Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence.'"  *Rosemond*, 572 U.S. at 73 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 178 (1993)).  The defendant's intent "must go to the specific and entire crime charged"; "[a]n intent to advance some different or lesser offense is not, or at least not usually, sufficient."  *Id.* at 76.  A defendant must do more than just "'associate himself with the venture'"; he must participate and act in a way "'to bring [it] about'" and "'make it succeed.'"  *Id.* (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).

Buchanan does not contest that breaking out the windows of Colossal Cupcakes satisfies the act requirement or that other principals committed Hobbs Act Robbery; he contends only that he did not intend to facilitate the crime.  But a reasonable jury could have inferred that he did based on several pieces of evidence.  Evidence showed the general environment of "mayhem" on Euclid Avenue:  "[B]asically everywhere . . . had been broken into, and people were going in and out of [stores] carrying stuff in and out."  The rioters were breaking windows and "jumping in windows

and pulling stuff out of the inside of" stores. Further, the Government introduced evidence tending to show that Buchanan knew people were inside Colossal Cupcakes: Kandah testified that she was still in the main part of the store and pleaded with the rioters before they entered, and text messages showed that Buchanan was aware of Kandah's presence in the store when he smashed the first window. In short, sufficient evidence existed that a reasonable jury could find Buchanan was an "active participant" in a criminal venture with "full awareness of its scope" and had "determined . . . to do what he [could] to 'make [that scheme] succeed.'"[2] *Rosemond*, 572 U.S. at 78-79 (quoting *Nye & Nissen*, 336 U.S. at 619) (second alteration in *Rosemond*).

### 2.  Count 2: Tampering With Evidence

The second count of the indictment charged Buchanan with tampering with evidence, often called obstruction of justice, in violation of 18 U.S.C. § 1512(c)(1). Buchanan argues that the evidence was insufficient to convict him for tampering with evidence because it did not show that an official proceeding was reasonably foreseeable when he disposed of the orange sweatshirt, shoes, and durag he was wearing during the riot.

To secure a conviction under § 1512(c)(1), the Government "needed to prove that the defendant knowingly and 'corruptly' altered or destroyed a document or object with the intent to impair that document or object's use in an official proceeding." *United States v. Sterling*, 860 F.3d 233, 245–46 (4th Cir. 2017); *United States v. Mehmood*, 742 F. App'x 928, 936 (6th Cir. 2018) (finding the same elements). Additionally, we have applied a nexus requirement in the context of another subsection of the obstruction statute, § 1512(c)(2), "to limit obstruction liability to cases

---

[2] Contrary to Buchanan's argument otherwise, there is no need for "direct evidence of actual communication between the aider and abett[or] and the principal [to] be introduced." *United States v. Lawson*, 872 F.2d 179, 181 (6th Cir. 1989) (quoting *United States v. Bradley*, 421 F.2d 924, 927 (6th Cir. 1970)). The terms aiding and abetting have a "broader application" than, for example, a conspiracy, because they do not "presuppose the existence of an agreement." *Pereira v. United States*, 347 U.S. 1, 11 (1954) (citing *Nye & Nissen*, 336 U.S. at 620)).

where the defendant foresaw, or could reasonably foresee, that his conduct would interfere with an official proceeding." *United States v. Wellman*, 26 F.4th 339, 347 (6th Cir. 2022). Both parties agree that *Wellman*'s nexus requirement logically applies to prosecutions under § 1512(c)(1) because the statute uses the same language, and the jury was instructed on it.

*Wellman* warned against "conflating obstruction of an official proceeding with obstruction of a mere criminal investigation unconnected with an official proceeding," but noted that where specific evidence in the record "reveals that a defendant acted with awareness 'that he was the target of an investigation' and that 'the government might be trying to build a case against [him],' the nexus requirement is satisfied." *Id.* at 348 (quoting *United States v. Persico*, 645 F.3d 85, 108 (2d Cir. 2011)). Ultimately, a defendant "need not have known an official proceeding was ongoing, just that it was foreseeable his conduct would interfere with one" because any other rule "would create the perverse incentive for defendants to obstruct justice more proficiently." *Id.* at 349.

Buchanan argues that the evidence was insufficient to show that his disposal of the clothing was in light of a reasonably foreseeable official proceeding. The evidence does not directly show when Buchanan disposed of the orange shoes, sweatshirt, and durag he was wearing on May 30. On May 31, Buchanan exchanged messages that he had seen a video of himself, and he was "so happy they ain't got my face." The other person responded: "Why would you wear that bright ass orange[?] You probably in hella videos[.]" Buchanan also received a text saying, "They want to hang you about that shit." The FBI press release featuring Buchanan in the orange clothing was issued on June 8, and Buchanan switched his Instagram profile, which featured a picture in the clothing, from public to private within an hour of its issuance. Law enforcement arrested

Buchanan on June 11, and on the morning of June 12, he told the investigators that he had disposed of the clothing.

Buchanan submits that this evidence is not sufficient to satisfy the nexus requirement, pointing to the indictment's charge that he disposed of the orange clothing "on or about May 30, 2020 through on or about June 1, 2020." "When 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established." *United States v. Ford*, 872 F.2d 1231, 1236 (6th Cir. 1989). Crediting the circumstantial evidence, specifically Buchanan's actions regarding his Instagram privacy settings, a reasonable jury could conclude that Buchanan disposed of the clothing after the FBI press release. In that scenario, his actions satisfy the nexus requirement because he would have been aware when he disposed of the clothing that he was the target of an investigation, and that the government was building a case against him. *See Wellman*, 26 F.4th at 348.

Even assuming Buchanan disposed of the clothing prior to the FBI press release on June 8, a reasonable jury could still find that it was foreseeable to Buchanan that his conduct would interfere with an official proceeding. *See id.* at 349. On May 31, Buchanan sent messages that he was "so happy" that his face had not been captured in one video and received messages questioning why he would wear such distinctive clothing and stating that "they" wanted to "hang" him about his actions. That Buchanan disposed of all three orange items of clothing, in and of itself, indicates his awareness that an official proceeding could be forthcoming. In closing argument, defense counsel argued that Buchanan disposed of the sweatshirt because it had a hole in it, but that innocuous theory does not account for why he also disposed of the shoes and the durag. Sufficient evidence existed that a reasonable jury could find the requisite nexus; finding otherwise would

reward Buchanan for "obstruct[ing] justice . . . proficiently." *Id.* The district court did not err in denying Buchanan's Rule 29 motion regarding the tampering with evidence charge.

**B.     Admission of Evidence of Uncharged Conduct**

Prior to trial, the Government moved to admit "additional evidence of uncharged conduct" tending to show that Buchanan vandalized or looted three other businesses located within a few blocks of Colossal Cupcakes. We briefly summarize the additional evidence the Government sought to admit.

*Huntington Bank.* The Government sought to introduce evidence recovered from Buchanan's cell phone showing that he threw a large object through the revolving door of Huntington Bank. This occurred prior to the incident at Colossal Cupcakes.

*Geiger's Sporting Goods.* The Government sought to introduce evidence tending to show that Buchanan stole a mounted deer head from a sporting goods store. The evidence consisted of a picture of Buchanan with the deer head on a sidewalk and text messages stating that he got "a deer head for the studio." This occurred after the incident at Colossal Cupcakes.

*City Tap Bar and Restaurant.* The Government sought to introduce evidence that Buchanan stole liquor from a restaurant that was looted. The evidence consisted of a picture of a man in a bright orange sweatshirt outside City Tap loading the truck of a vehicle that belonged to Buchanan's brother, text messages stating Buchanan was with his brother at the relevant time, social media messages sent from Buchanan's account stating, "they only had 2 Crown bottles and I sold them both," and cell phone location data showing that Buchanan was within a block of City Tap at the relevant time. This occurred after the incident at Colossal Cupcakes.

As an initial matter, the trial transcripts reveal that Buchanan did not object to the admission of the video showing the Huntington Bank incident or to certain text messages that included a

general discussion about looting and specific discussion about Colossal Cupcakes. In his opening statement, moreover, his counsel played the video of the Huntington Bank incident to support the defense theory that Buchanan's intent was only to destroy property. We consider these issues waived and limit our analysis to the evidence regarding Buchanan's actions at Geiger's Sporting Goods and City Tap.

The Government argued that this evidence was admissible on two grounds: (1) as evidence "inextricably intertwined" with the charged conduct or (2) as other acts evidence for the purpose of showing motive, intent, and opportunity pursuant to Rule 404(b). Prior to trial, the district court indicated that it was "inclined to let it in" but wanted to hear the testimony before definitively ruling. At trial, the district court admitted the evidence over Buchanan's objection and provided a limiting instruction to the jury that explained permissible uses of the other act evidence under Rule 404(b).

On appeal, Buchanan argues that the district court abused its discretion in admitting evidence of uncharged conduct under either of the Government's proposed grounds. He contends that the evidence was improper character propensity evidence and should have been excluded. We generally review evidentiary rulings for abuse of discretion. *United States v. Hazelwood*, 979 F.3d 398, 408 (6th Cir. 2020). However, "[s]ome panels of this Court have argued that there is an intra-circuit split regarding the correct standard of review for a district court's decision to admit Rule 404(b) evidence." *United States v. Mandoka*, 869 F.3d 448, 456 (6th Cir. 2017). Some have applied the abuse of discretion standard, *see id.*, while others have followed a three-step process:

> First, we review for clear error whether there is a sufficient factual basis for the occurrence of the "bad act" that is being proffered as evidence (and challenged pursuant to 404(b)). Second, we determine *de novo* whether the evidence was proffered for an admissible purpose. Third, we review for an abuse of discretion

> whether the probative value of the proffered evidence is substantially outweighed
> by any undue prejudice that will result from its admittance.

*Id.* at 456-57 (citations omitted). We need not decide here which standard of review ought to apply because Buchanan's claim fails under either formulation; for purposes of this analysis, we will assume the tripartite standard of review applies.

As an initial matter, Buchanan does not dispute that the other acts occurred, so we proceed to consider whether the evidence was proffered for an admissible purpose.

Rule 404(b) bars using evidence of other acts to prove a "person's character in order to show that on a particular occasion the person acted in accordance with the character," but it permits use of such evidence for other purposes including opportunity, intent, and knowledge. Fed. R. Evid. 404(b)(1)-(2). Regarding using other acts as evidence of intent, we have stated:

> [W]here there is thrust upon the government, either by virtue of the defense raised
> by the defendant or by virtue of the elements of the crime charged, the affirmative
> duty to prove that the underlying prohibited act was done with a specific criminal
> intent, other acts evidence may be introduced under Rule 404(b).

*United States v. Johnson*, 27 F.3d 1186, 1192 (6th Cir. 1994). Our court considers Hobbs Act Robbery a specific intent crime.[3] *United States v. Dabish*, 708 F.2d 240, 242 (6th Cir. 1983); *United States v. Cobb*, 397 F. App'x 128, 137 (6th Cir. 2010).

Buchanan's theory of the case from his opening statement to his closing argument was that he was at the protests and subsequent riots only to engage in vandalism and property destruction—not to steal anything or commit robbery. That theory made Buchanan's intent a "material issue in the case" and opened the door for the Government to introduce other acts—Buchanan engaging in

---

[3] Buchanan cites the Sixth Circuit's opinion in *United States v. Carmichael* to argue otherwise, but that case held only that the district court was not required to give a jury instruction that "in order to convict Carmichael, it had to conclude that Carmichael intended to violate the Hobbs Act." 232 F.3d 510, 522 (6th Cir. 2000).

other looting activities—to evidence his intention at Colossal Cupcakes. *Johnson*, 27 F.3d at 1191-92. The admission of the evidence regarding uncharged conduct did not violate Rule 404(b)'s character propensity bar.

Finally, the district court did not abuse its discretion in finding that the probative value of the other act evidence was not substantially outweighed by undue prejudice. Although it was prejudicial, it was not unduly so; it did not include violence or other highly inflammatory actions. *See, e.g.*, *United States v. Clay*, 667 F.3d 689, 700 (6th Cir. 2012) (noting that prejudicial impact of uncharged conduct was high where evidence "suggested that [defendant] was a repeatedly violent offender"). Further, the district court provided limiting instructions contemporaneously and in its final charge to ensure the jury understood that Buchanan was only on trial for "the robbery of the cupcake place" and "there's a limited purpose for this type of testimony [about other acts.]" Those repeated limiting instructions "sufficiently mitigated the risk that jurors would consider [the other act evidence] for improper purposes." *United States v. Barnes*, 822 F.3d 914, 924 (6th Cir. 2016); *United States v. Perry*, 438 F.3d 642, 649 (6th Cir. 2006) (holding probative value of subsequent robbery for limited purpose was not substantially outweighed by unfair prejudice in light of repeated limiting instructions).

## C.    The District Court's Restitution Order

Buchanan appeals the district court's order awarding $228,887.61 in restitution, arguing that the district court erred in awarding restitution for lost profits and for losses not directly and proximately caused by his actions. We review whether restitution is permitted de novo and the amount of restitution for abuse of discretion. *United States v. Evers*, 669 F.3d 645, 654 (6th Cir. 2012).

"[R]estitution orders are proper 'only when and to the extent authorized by statute.'" *United States v. Church*, 731 F.3d 530, 535 (6th Cir. 2013) (quoting *Evers*, 669 F.3d at 655-56). Buchanan's Hobbs Act Robbery conviction implicated the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. Relevant here, "in the case of an offense resulting in damage to or loss or destruction or property of a victim of the offense," the MVRA requires a restitution order to award an amount equal to the "value of the property" on the date of loss or on the date of sentencing, whichever is greater, less the value of any property returned. *Id.*, §§ 3663A(b)(1)(B)(i)-(ii). Buchanan argues that the statutory language specifying an amount equal to the "value of the property" does not authorize the district court to award lost profits for the four months that Colossal Cupcakes was closed after the riots. His argument is grounded in the fact that the MVRA does not mention lost income for property offenses but does specify it for bodily injury offenses. Specifically, the MVRA allows for awards of "income lost by such victim as a result of [an offense resulting in bodily injury to a victim]." *Id.* § 3663A(b)(2)(C)

Relying on *United States v. Lively*, 20 F.3d 193 (6th Cir. 1994), the district court held it was authorized to award lost profits for a property offense under the MVRA.[4] In *Lively*, the defendant stole merchandise from the victim through mail fraud and then resold those items to third parties. *Id.* at 200. The district court awarded restitution in the amount of the retail value, *i.e.*, the sales price of the merchandise, and not the wholesale cost that the victim would expend to acquire these goods. *Id.* at 203. The defendant appealed arguing that the statute only allowed the district court to consider the wholesale value, not the businesses' lost profits. *Id.* The *Lively* court disagreed, noting that the statute did not expressly foreclose such an award and determining that

---

[4] *Lively* analyzed the Victim and Witness Protection Act, which contains identical language to the MVRA. *See* 20 F.3d at 200-01.

the district court could order restitution in an amount that would "cover a company's actual losses, which would be the retail price in the case at bar" since the victim no longer had this merchandise available to sell and awarding the retail price "was the only way to assure the restoration of these victims to their prior state of well being," the very purpose of restitution. *See id.* at 202-03 (discussing *Hughey v. United States*, 495 U.S. 411, 416 (1990), and legislative history for the purpose of restitution).

Buchanan attempts to distinguish *Lively* and relies on opinions from the Fourth and Fifth Circuits barring awards of lost profits for property offenses based on the plain language of the statute. *See United States v. Mitchell*, 876 F.2d 1178, 1183 (5th Cir. 1989); *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991). The Government argues that *Lively* controls and cites decisions from the Second, Ninth, and Tenth Circuits allowing awards for lost profits. *See United States v. Milstein*, 481 F.3d 132, 136-37 (2d Cir. 2007); *United States v. De La Fuente*, 353 F.3d 766, 768, 771-73 (9th Cir. 2003); *United States v. Wilfong*, 551 F.3d 1182, 1183-87 (10th Cir. 2008).

As an initial matter, Buchanan is correct that our decision in *Lively* is not directly on point. *Lively* concerned how to determine the present value of misappropriated consumer goods, opting to value goods at retail instead of wholesale price with the difference constituting the businesses' profits. 20 F.3d at 202-03. Here, the district court attempted to value not only consumer goods, like cupcakes, but also the operating capital of the business. Whether future estimated profits of Colossal Cupcakes can constitute the "value of the property" presents an issue distinct from the one raised in *Lively*. Indeed, in a case cited by the Government, the Tenth Circuit discussed this distinction after comparing the ostensibly competing holdings of the Fourth and Fifth Circuits in *Sharp* and *Mitchell* and the Second and Sixth Circuits in *Milstein* and *Lively*. *See Wilfong*, 551 F.3d at 1185-86. Ultimately, the Tenth Circuit affirmed an order awarding restitution for "lost

employee work time" due to a bomb threat but explained that the order was not "compensating for lost profits or income" or "the diminution in future income," only "giv[ing] the government compensation for the cost of the property that was destroyed by [the defendant]'s actions." *Id.* at 1186.

In *Mitchell*, the defendant stole several trucks, and the district court awarded the victims restitution for lost income for the period the business could not use its trucks. 876 F.2d at 1183. The Fifth Circuit vacated the restitution order, relying on the logic Buchanan now uses:

> Congress is clearly capable of authorizing restitution for lost income when it chooses to do so. Despite this fact, it has not included lost income in the type of restitution that may be ordered in property cases and, unless and until it amends the statute to include lost income, courts may not order such restitution in property cases.

*Id.* (citations omitted). The Fourth Circuit in *Sharp* also relied on the plain language of the statute but notably distinguished and affirmed restitution measured by the cost of repairs to a damaged mine. 927 F.2d at 174.

The Government relies on the Second Circuit's opinion in *Milstein* in which the defendant violated trademark law by distributing misbranded drugs, and the district court awarded restitution to drug manufacturers based on the value of lost sales. 481 F.3d at 137. After noting *Sharp* and *Mitchell*, the Second Circuit instead determined that "[n]othing in the text or legislative history of the [Act] precludes restitution for lost profits under section 3663(b)(1) where such losses amount to the 'value of the property' the victim lost." *Id.* at 136. It distinguished both cases, explaining that they "confuse the loss of income suffered by a victim of personal injury with the very different notion of lost profits as a measure of loss suffered by a victim of misappropriation of property." *Id.* Ultimately, *Milstein* held that the value of the property—intangible trademarks—could be measured by the victims' lost sales caused by the defendant. *Id.* at 137.

At issue is the proper interpretation of the term "value," which is undefined in the statute. We agree with *Milstein* that nothing in the statutory language prohibits restitution for lost profits where such losses amount to the "'value of the property' the victim lost." 481 F.3d at 136. In this case, that would be the retail price of cupcakes and other stolen items that could have been sold by the victim on the day of the offense. Ultimately, however, the statutory language is both the "starting point for interpretation" and the "ending point if the plain meaning of that language is clear." *United States v. Henry*, 819 F.3d 856, 870 (6th Cir. 2016). Because the statute does not provide for the recovery of lost income for offenses resulting in property damage, the district court's restitution order including lost potential income during the time period the store was closed for repairs was in error.

Accordingly, the restitution order in this case may account for the retail price of the cupcakes and other items stolen on May 30, 2020 (in addition to the cost of repairs), but not for any speculative losses such as potential profits that may have been earned during the timeframe due to the closure of the business for repairs. *See United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015) ("Although the MVRA does not require courts to calculate restitution with *exact* precision, *some* precision is required—'[s]peculation and rough justice are not permitted.'" (quoting *United States v. Ferdman*, 779 F.3d 1129, 1133 (10th Cir. 2015)).

Buchanan also argues that the district court erred in holding him responsible for losses he did not proximately cause.

Of course, the loss attributable to a defendant under the MVRA is limited by the traditional principles of "but for" and proximate causation. *United States v. Scudder*, 746 F. App'x 454, 457 (6th Cir. 2018) (quoting *In re McNulty*, 597 F.3d 344, 350 (6th Cir. 2010)). Under the MVRA, a "victim" is a person "directly and proximately harmed as a result of the commission of an offense."

18 U.S.C. § 3663A(a)(2). District courts are authorized to impose "full liability on any defendant" as long as his conduct was a material cause of the loss. *United States v. Church*, 731 F.3d 530, 537-38 (6th Cir. 2013).

Buchanan's conduct was a direct and material cause of a foreseeable loss to Colossal Cupcakes. As the district court noted:

> [I]t was reasonably foreseeable when Mr. Buchanan broke the windows in the midst of a riot that he would be allowing looters and vandals into the victim's business. Further, based on the evidence presented at trial, including the fact that he continued breaking windows while the destruction and damaging of the victim's property was on-going, and bragged about giving away the victim's goods, the Court finds that he actually intended for the damage and destruction to take place. Further, it was reasonably foreseeable that committing, encouraging and facilitating this damage would lead to at least a temporary closing of the victim's business, resulting in lost profits. No reasonable person could have broken out the windows of a storefront, in the midst of a riot, surrounded by other looters and vandals, and not expected the business to suffer significant property damage and lost profits.

(R. 98, Restitution Order, PageID 1214)

Buchanan relies primarily on *Paroline v. United States*, in which the Supreme Court held that, under 18 U.S.C. § 2559, a single defendant convicted of possession of child pornography was not liable to a victim for her total loss of "millions of dollars . . . collectively caused by thousands of independent actors[.]" 572 U.S. 434, 456 (2014). But we subsequently explained that *Paroline* "distinguished the hundreds or even thousands of perpetrators of child pornography who 'ha[ve] no contact with the overwhelming majority of the [other] offenders' from 'a set of wrongdoers acting in concert' such as a 'gang of ruffians [that] collectively beats a person.'" *United States v. Sawyer*, 825 F.3d 287, 295 (6th Cir. 2016) (quoting *Paroline*, 572 U.S. at 454). Here, Buchanan was acting in concert with other rioters. The district court did not err in awarding restitution for damage other looters inflicted on Colossal Cupcakes resulting from Buchanan's actions.

In sum, the district court erred in awarding restitution for the speculative lost profits suffered by Colossal Cupcakes for the four-month period it was closed after the riots on May 30, 2020; however, the district court did not otherwise err in awarding replacement, repair, and construction costs. *See Sharp*, 927 F.2d at 174 (affirming award of repair costs but not lost income).

## III.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment and **VACATE** and **REMAND** its restitution order for recalculation in accordance with this opinion.

**McKEAGUE, Circuit Judge, concurring in part and dissenting in part.** I join the majority's resolution of Buchanan's sufficiency-of-the-evidence and Rule-404(b) claims. However, I disagree with the majority's narrow view of restitution available for property offenses under the Mandatory Victims Restitution Act (MVRA). Because I interpret property "value" to encompass lost profits, I respectfully dissent and would affirm the district court's restitution order.

Buchanan claims that the district court erred in awarding lost profits as restitution. Citing decisions from the Fifth and Fourth Circuits, he argues that the MVRA's language does not authorize the recovery of lost income for offenses resulting in property damage. *See United States v. Mitchell*, 876 F.2d 1178, 1183–84 (5th Cir. 1989); *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991). The majority agrees. It concludes that the district court exceeded its statutory authority by ordering restitution for lost expected income during the time period Colossal Cupcakes was closed for repairs. Maj. Op. at 18.

The MVRA awards restitution to victims of certain crimes—including Hobbs Act robbery—who suffer pecuniary loss. *See* 18 U.S.C. § 3663A. As the majority correctly notes, "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense," the statute compels a restitution award equal to the "value of the property" on the date of loss or on the date of sentencing, whichever is greater, less the value of any property returned. *Id.* § 3663A(b)(1)(B); Maj. Op. at 15. The MVRA does not, however, define "value." Circuits thus disagree about whether courts may award restitution for lost profits as part of the "value of the property" damaged. *Compare, e.g.*, *United States v. Milstein*, 481 F.3d 132, 136–37 (2d Cir. 2007) (allowing lost profits), *with Mitchell*, 876 F.2d at 1183–84 (barring lost profits), *and Sharp*, 927 F.2d at 174 (same).

We addressed the lost-profits issue in *United States v. Lively*, 20 F.3d 193 (6th Cir. 1994). There, the defendant stole merchandise from several victims and then resold the merchandise to third parties. *Id.* at 195. The district court awarded restitution that included the retail value of the stolen items, rather than merely the wholesale cost that the victims would expend to replace them. The defendant argued on appeal that the restitution statute only allowed the district court to consider the merchandise's wholesale value, not the victims' lost profits. *Id.* at 200. But we firmly rejected that argument and affirmed the restitution order. We reasoned that the statute did not expressly foreclose such an award and held that "including lost profits . . . was the only way to assure the restoration of these victims to their prior state of well being." *Id.* at 202–03. That interpretation, we explained, furthers the very purpose of restitution and the legislative history behind the MVRA. *Id.* (citing *Hughey v. United States*, 495 U.S. 411, 416 (1990)).

*Lively* controls the present dispute, notwithstanding the majority's attempt to distinguish it. The majority argues that *Lively* addressed only "how to determine the present value of misappropriated consumer goods" and does not implicate attempts "to value the operating capital of [a] business." Maj. Op. at 16; *see also United States v. Wilfong*, 551 F.3d 1182, 1185–86 (10th Cir. 2008) (drawing a similar distinction). I disagree. To be sure, *Lively*'s facts differ in several ways from those in this case. But *Lively* stands for the broader principle that the MVRA requires courts to shape restitution orders to make victims whole—which might involve lost profits under certain circumstances. *Lively*, 20 F.3d at 202–03; *see also Milstein*, 481 F.3d at 136–37 (citing *Lively* approvingly in affirming lost-profit restitution award for estimated lost sales after defendant misappropriated victim's trademark). As both *Lively* and *Milstein* recognized, nothing in the statutory language prohibits restitution for lost profits. And the MVRA's purpose is promoted when courts treat lost income as part of the "value of the property" damaged.

The district court's restitution order was thus proper. Buchanan's actions caused the destruction and theft of operating capital that produced income for Colossal Cupcakes. The shop remained closed for several months as it carried out necessary repairs. It is not unreasonable, based on such facts, to value the complete disruption of business operations as the lost income incurred by the shop while its doors were shuttered. After all, district courts are empowered to consider each case's particular factual circumstances when determining the best way to value the property at issue. *See Wilfong*, 551 F.3d at 1184 n.2. The district court concluded that the only way to restore the Colossal Cupcakes proprietor to her "prior state of well being" involved compensating her for profits lost while her shop was closed for repairs. *Lively*, 20 F.3d at 202–03. That choice is consistent with the "wide latitude" district courts have in determining a victim's loss, *United States v. Patel*, 711 F. App'x 283, 287 (6th Cir. 2017), and nothing in the MVRA precludes it.

For these reasons, I respectfully dissent in part and would affirm the restitution order.